[No. 30036. Department Two. April 2, 1947.]

A. E. RADEMACHER et al., Appellants, v. HERBERT S. RADEMACHER et al., Respondents.[1]

Velikanje & Velikanje, for appellants.

Hugo F. Luhman and M. C. Delle, for respondents.

[1]Reported in 178 P. (2d) 973.

JEFFERS, J.—This action was instituted by A. E. Rademacher and Margaret Rademacher, his wife, against Herbert S. Rademacher and Thelma Rademacher, his wife, in the superior court for Yakima county, on or about June 6, 1945.

The purpose of the action was to compel specific performance of an option to purchase contained in a written lease, dated December 8, 1943, which lease plaintiffs alleged was entered into by the parties to this action. The term of the lease was for a period beginning on November 20, 1943, and ending November 20, 1948. The particular provision contained in the lease relative to the option reads as follows:

"It is further agreed that the lessees under this contract shall have the option of purchasing the property described herein at an agreed price of $10,000.00, plus the cost of any capital investment which may be placed on the property by the lessors subsequent to the signing of this lease. The terms and conditions of said purchase to be agreed upon by the parties at the time of exercising said option. This option may not be exercised prior to November 20, 1944, nor after the 1st of June of any year during the term of this lease. Should the lessees desire to exercise this option after the first day of June of any year, the terms of this lease shall apply for that year and the crop then growing shall be divided according to the terms of this lease."

Defendants, by their answer, admitted that plaintiffs were in possession of the premises described in the lease attached to and made a part of plaintiffs' complaint; denied that plaintiffs were in possession by virtue of such lease; and admitted that on or about May 28, 1945, plaintiffs tendered to them the sum of thirteen thousand dollars and asked for a conveyance of the property, which tender defendants refused. Defendants admitted that they refused and still refuse to convey to plaintiffs the property described in the complaint, and denied that plaintiffs have been damaged in the sum of thirteen thousand dollars or in any other sum.

As a further and affirmative defense, defendants in sub-

stance alleged that, on or about December 8, 1943, defendants prepared and signed the written instrument a copy of which is attached to plaintiffs' complaint, and tendered and delivered such instrument to plaintiffs for their signature and execution; that, shortly after such tender and delivery, plaintiffs notified defendants that they would not sign or execute such instrument and further stated that they were not interested in purchasing the property, nor in a lease for more than one year. Plaintiffs, however, retained possession of the instrument.

It is further alleged that, on or about May 1, 1944, the parties orally agreed that defendants should lease to plaintiffs the real property described in plaintiffs' complaint for the year 1944, the terms of such oral lease being the same as those set forth in the instrument attached to plaintiffs' complaint, except that no option to purchase was included therein; that plaintiffs, who were then in possession of the property, occupied and farmed the same under the terms of such oral lease during the year 1944.

It is further alleged that, on or about March 12, 1945, plaintiffs still being in possession of the premises, the parties entered into another oral lease for the year 1945, the terms of which were the same as those of the oral lease for 1944, with the following exceptions: By the terms of the 1945 lease, defendants (lessors) were to haul their one-third rental share of the crops, instead of plaintiffs delivering such one-third to defendants, as provided in the 1944 lease; and, by the terms of the 1945 lease, plaintiffs (lessees) were to supply the power for moving all of the fruit crop out of the orchard, instead of defendants supplying such power, as provided in the 1944 lease.

It is further alleged that defendants have performed, or now stand ready and willing to perform, all of their obligations as lessors under the oral lease of 1945; and that defendants are entitled to one third of all crops produced upon the premises for the year 1945. No accounting or settlement of the 1945 crop has been made.

Plaintiffs, by their reply, denied and put in issue the affirmative matter set out in defendants' answer.

The cause came on for trial before the court on January 3, 1946. At the conclusion of the hearing, the court took the cause under advisement and, on February 13, 1946, made and filed its memorandum decision, wherein the court stated that, in its opinion, plaintiffs were not entitled to specific performance of the option to purchase, or to damages, and that their action should be dismissed.

On February 13, 1946, plaintiffs filed a motion for decision notwithstanding the oral decision of the court or, in the alternative, for new trial. On March 16, 1946, the court entered an order denying this motion, and in this order it is specifically stated:

"It is now here ordered that the plaintiffs' motion for decision notwithstanding decision of the court or in the alternative for new trial be denied on the ground *that the parties hereto had never entered into the five-year lease as alleged by plaintiffs.*" (Italics ours.)

On March 16, 1946, a judgment of dismissal was entered, from which judgment plaintiffs have appealed. No findings of fact or conclusions of law were made or entered.

Appellants make six assignments of error, but, as stated by appellants, they all relate to the main question, namely: Was the written lease and option to purchase, dated December 8, 1943, actually executed and entered into between the parties, and, if so, did it remain a valid and binding lease up to and including the time when appellants made their tender to take up the option to purchase?

This action involves a bearing orchard in the Yakima valley. A. E. Rademacher and Herbert Rademacher are brothers. There is a conflict in the testimony as to just when appellants actually signed the written lease and option, it being the general contention of respondents that appellants never operated the ranch under such written lease and did not sign it until shortly before May 28, 1945, at which time it was apparent there would be an unusually large crop of fruit produced upon the property.

There is also a conflict in the testimony relative to whether or not any oral lease was made and entered into by and between the parties for the year 1944 and the year 1945.

We shall hereinafter refer to appellants as Austin and Margaret, and to respondents as Herbert and Thelma.

Herbert had owned and operated fruit ranches in the Yakima valley for a number of years prior to the time here involved. During the time with which we are here concerned, he owned and operated a fruit ranch in the Tieton district. In the spring of 1943, Herbert had purchased on contract what will be referred to as the Gromore orchard from Mr. and Mrs. Urquhart. This was a twenty-acre orchard and was about fifteen miles from Herbert's home.

Margaret and Austin had both worked for Herbert during apple harvest on prior occasions, and he considered them good workers. It being difficult to procure labor in the Yakima valley during the fruit season of 1943, and especially at harvest time, Herbert telephoned to Margaret at her home in Anacortes, asking her and Austin to come over and assist him during the apple harvest. At that time, Austin apparently was working on the Alcan highway but was expected home. Shortly after this telephone conversation, Austin returned to Anacortes, and about the middle of October, 1943, he and Margaret went to Yakima to assist Herbert harvest his crop.

Sometime after their arrival in Yakima, the question of Austin leasing the Gromore place was brought up. Margaret said it was first suggested by Herbert, and Herbert said it was suggested by appellants. Be that as it may, sometime, probably in November, 1943, a pencil memorandum of a lease of the Gromore place, containing an option to purchase after the first year and not later than June 1st of any year, for ten thousand dollars, was prepared by Herbert and submitted to Austin and Margaret. This memorandum was admitted as plaintiffs' exhibit No. 2.

Thereafter on December 8, 1943, Herbert and Thelma went to Yakima and had their attorneys draw up a formal lease for five years, beginning November 20, 1943, and ending November 20, 1948. This lease contained the usual covenants of leases of fruit orchards in the Yakima valley, and in addition it contained the option to purchase hereinbefore referred to. Herbert and Thelma signed the original and copy of the lease, and their acknowledgments were taken before a notary public. On the same day, after the leases had been executed, respondents drove to the Gromore place to see appellants and have them sign the lease.

It is from this point that the trouble between the parties started, and it is the conversation which occurred between them at the Gromore ranch on December 8, 1943, and subsequent conversations to which we shall refer, together with the acts of the parties, which show the material facts upon which the judgment entered was based. Much of what was said at and during the various conversations above referred to is in dispute.

It may be stated here that the record is replete with evidence that during the year 1944, and especially after the month of April, 1944, when Austin became sick, Herbert did everything he could to assist appellants in the operation of the Gromore place. Much of this assistance Herbert was not legally bound to give, and we are impressed with the fact that such assistance was given because Herbert desired to help his brother get started and make a success of operating the ranch.

We now return to the meeting of the parties on the evening of December 8, 1943, at the Gromore ranch. It may be stated that, while the pencil memorandum to which we have referred provided for a one-year lease, with option to renew for any time up to and including five years, the written lease respondents had prepared and signed was a straight five-year lease. We quote from Herbert's testimony as to what occurred at this meeting on December 8th:

"A. I handed each one a copy. Q. Oh, yes, I see. Well, just state what happened. A. They both started to read

and I don't believe Margaret had finished the first page when she exclaimed, we didn't agree to any such damned thing as you've got written in here at all, and threw her lease down on the table, and I attempted to explain with the—and to go ahead and read the lease, that everything we had agreed on, as set forth in that instrument, was in the lease, and she accused me of being picayunish and adding in a lot of stuff we hadn't talked to at all. I explained that was common practice for leases drawn in this country, the lessor had to be protected some way about some of these things and— Q. Did she say anything — What was it? Can you recall specifically what it was she objected to that was in the lease? A. She picked up the clause of the recapture clause there of short notice, and she picked up the statement of pasturing the stock in the orchard. Q. Oh, yes. A. And made an issue of it. Q. What did you say in answer to that objection? A. Well, I got mad and told her if she wasn't so thickheaded she'd read that lease and when she got through, she could do some talking then, and then if she would read it, she would find out everything we had agreed upon was properly drawn and put in that paper. Q. All right, now, what did she say then? A. She says— Q. Did she read it some more? A. I picked it up. She said, we talked of an option, there's supposed to be an option in here. That is when I told her if she'd just hold herself in line and read that, she would find out the option was in there. I opened the page and showed her. She said, I don't care, we want time to look it over, we won't sign it, we want to take this and have our attorneys look it over. Q. Did she say, at any time that evening, she was ready and willing to sign that lease? A. No, she said she wasn't ready, and so did Austin. Q. All right, just tell us, just finish up there, what happened. A. So when they said they wanted time to investigate that lease and have their counsel look at it, I said, that is all right; that is all right with me. You're going home tomorrow for the Christmas holidays, take both these copies with you; they had them in their hands then; take these, both copies, with you, take them to your counsel and have them investigated, and if there is anything in those leases that shouldn't be there, or anything omitted, when you come back after Christmas, you bring it up and if there's a change made, we will make the change; otherwise sign those copies and give them to me, give me my copy. Q. They were going to leave Yakima county, were they, then? A. They were going, I think, the next day or

the day after— Q. Over to the coast? A. —back to Anacortes. I think at that time they were leaving for their merchandise, for their household goods."

Thelma's testimony tended to corroborate that of her husband's as to what was said by the parties at this meeting.

Margaret's version of what occurred at the above meeting, and what was said, is as follows:

"They gave my husband a copy and I took a copy. We started to read the lease and I read the first page, and on the last line of the first page and next two or three lines refers to a cow, what you do with a cow, about not tying a cow here and there, and I said, when I read that, I says, I'm not going to sign that crazy old thing. And Herb says, why not? I says, well, who made up this lease? He said, well, the notary public made it up, he said, that's a form. I said, I have always had a cow all my life. I've never let her run around and annoy people. I don't see why that has to be in there. Well, he jumped on me; he said, why don't you keep your mouth shut until you get through reading. You're just like my brother Owen, pick up something that doesn't amount to anything. I went ahead and finished reading the lease. My husband read his. *I said, I'll sign the lease.* I don't know anything about fruit leases, leases of any kind; you say it is all right, I'll sign it. He said, no, don't sign it. You're going home for Christmas, take it home, study it over. You folks read it and my folks can read it, and see if you don't think it is a good lease. If you find anything that isn't good, find anybody else does more for their people in a lease, then we will—let me know. We took the lease home with us. We went home and spent the holidays and packed our stuff and came back, moved back the first of January. The lease was packed away—or, the two leases was packed away in a dresser drawer. We came back and went to work on the farm and the lease laid in the dresser drawer for many, many months. Q. You didn't move over to Yakima until after this lease had been presented to you? A. No, we hadn't moved over. We had been camping temporarily on apple boxes and what not there while we were painting and Kemtoning the house and fixing it up, but we didn't move over until January first, 1944. Q. Had you had any conversations about an option? A. Yes, definitely. During the time that we were at Herb's picking apples and he

wanted us to take this place, he wanted us to take the place on a 5-year lease straight, and we said no, that we had never farmed apples. It was my first experience in farming apples and I said, if we farm apples a year and we like it, we're going to want to buy a place, and we wouldn't take it unless we could take an option to buy it. And Herb said—first he refused. We were arguing about it around there off and on for several days, and we said, well, we could go home, we didn't have to take the place. And finally he said, well, he says, I'll give you a lease to buy but, he says, I'm going to have the first crop—he said, I want a third of the first crop off of it. And that's how we got to have an option in there." (Italics ours.)

Austin's testimony was to the effect that he made no objection to the lease presented by Herbert, but he did not sign because he wanted more time to look it over; that he and Margaret took the lease to the coast with them, and that he did study it; that he never told Herb he had any objection to the lease.

Appellants returned from Anacortes about the first of January, 1944, with their household furniture, and took up their residence on the Gromore place. They retained both copies of the lease, and it does not appear that anything further was said by any of the parties about the lease until the latter part of April or first part of May, 1944.

On April 13th, Austin suffered a heart attack and was in the hospital for eleven days, being thereafter confined to his bed at home for six or seven weeks. During this period, as stated, Herbert did everything possible to assist appellants with the ranch work. He went there personally and took his men and helped put on the spray.

We now come to the next conversation between the parties, which occurred during the time Herbert and his men were putting on the calyx spray, in May, 1944. Herbert had assisting him Ben Smith, who had worked for him since 1941, Ronald King, who operated a ranch next to Herbert and had worked for him, and Walter Baumgartner. Austin was still confined to his bed at this time. On the occasions when Herbert and his men were assisting Austin, Margaret usually prepared the noon meal for

them, and the men became well acquainted with Austin and Margaret, often going into the bedroom to visit with Austin.

On the day on which the conversation above referred to occurred, Herbert, Ben Smith, and King had stopped spraying, and just before going home they went in to see Austin. Margaret was in the room, and according to Herbert, the following conversation took place:

"I says, Aus, I don't think you're going to die, I don't know whether I'm going to or whether my wife is, if either one of us died, or both of us, we wouldn't have anything to show our interest in this operation down here. You were to sign those leases four months ago and give us our copy, and to now we haven't heard a word about it. I want you to sign those leases now and give us our copy. Margaret spoke up and said, Herb, those leases are in that dresser drawer; and pointed to a dresser behind me. She says, they've been there four months, they aren't signed, we aren't going to sign them; we are not interested in this place, it is too large a place, it is too much work, it is too expensive for us to operate; all I'm interested in is getting my husband well and getting off this place with losing as little money as possible. Austin spoke up and said, Herb, you had better pay us off and take over. He says, I'm down and out for the summer and I don't know how long; Margaret don't know a thing about running a ranch, running this orchard; if we stay, you'll have to do it, anyway. And that proposal, I countered and said, if you leave now, Aus, you'll lose money; I'd rather you'd go ahead with this, try to finish this year out; we'll help you every way we can; do the best you can, Margaret, call on us when you need help and we will be your back-log, we'll be here, you can depend on us. She says, if you'll do that, I'll go ahead and finish the year. Q. And was anything else said? A. Well, the only—the only thing I could clarify the meaning, is when they refused to sign the leases and deliver them."

Ben Smith, who testified he was present and heard the above conversation, stated:

"A. Herb spoke up and said, Aus, have you folks ever signed that lease yet? And Margaret said, no, nor we ain't interested in that lease right now; all I'm interested in is getting my husband well and getting him out of here

as quick as possible. Q. All right, anything else said? Try to talk slowly, if you can. A. And Margaret said, no, I haven't signed that lease yet. I ain't agoing to. It's right there in that dresser drawer."

This witness also testified as to work which he and other of Herbert's employees did on the Gromore place to help appellants.

Ronald King testified he was present and heard the above conversation. He corroborated Herbert's statement of what occurred, and, among other things, stated:

"And at that time Margaret spoke up and she said, well, we aren't signing the lease; you were told before there were things in it we didn't like; it is in the dresser drawer; it isn't signed and we are not going to sign it."

Margaret testified that Ben Smith and Ronald King were not present when the above conversation took place; that no one was present but Herbert, Austin, and herself. We quote Margaret's version of what took place:

"Q. Will you tell us what the conversation was? A. Of course, we have been on quite friendly terms, and he came in and we were taking about this or that, I don't remember what it was, but he did say to me, he said, Margaret, have you signed my lease? And I said, no, I haven't, Herb. I said, they're in the drawer there. And he called my husband in the bedroom or my husband called him in the bedroom, and said to him, he said, Herb, for your good and our good, I believe you'd better take the place back. I don't know how long I'm going to be in bed. You know what the doctor said, and I don't know how long I'm going to be in bed, whether I'll be able to operate the place or not. He says, I know I'm going to be laid up for a while, and for your good and our good, maybe you'd better take the place back. And he says no. No, he says, everything looks fine; he says, the pruning is done and the spraying is going on, and everything looks good. We'll let it go like it is. I believe, Aus, you're going to get up out of bed and be all right. We'll just let it go for a while and see what happens. That is all the conversation that took place. Q. Did he ask you at the time to sign the lease? A. No, he never said— He did say to me, Margaret, what about my lease? Have you signed it? I said, no, we haven't. It is in the dresser drawer there. Q. Has he ever asked for the return of those leases? A. He's never, to

this day, asked for the lease. Q. Did you have any conversation that day as to the modification of this written lease? A. No, I didn't hear anything about another lease at all. That is all the conversation that took place about the lease."

Austin's testimony corroborated Margaret's as to what took place at the time last above mentioned.

Sometime the latter part of December, 1944, or first part of January, 1945, the parties made a complete settlement of the 1944 operations, except as to the Winesap apples, on the basis of one third of the proceeds of the crop to Herbert and two thirds to Austin, after certain credits were deducted. The items entering into this settlement are shown by defendant's exhibits Nos. 5 and 6. The Winesaps were subsequently sold and the proceeds divided on the same basis as the rest of the 1944 crop.

The next conversation material to this controversy occurred about January 16, 1945, in the Golden Wheel, a restaurant in Yakima. We quote from Herbert's testimony:

"I think we met them by appointment in Yakima, and we had dinner at the Golden Wheel, and in the course of the conversation, I asked them, what are you going to do this year? Do you want to farm the place again? Austin, or Margaret, countered with the statement that that place is— the soil was too shallow on that ranch, the trees are too close, we put up with a lot of grief, it takes too much labor to farm that place. And Austin said, Herb, the trees are altogether too close; it would be to your benefit and mine if you'd pull half of those trees. Well, I says, Aus, I know it would be to your benefit to pull half the trees, but it would take half of any income off that place from us. Well, it wouldn't amount to that much, he said, you'd have better color, you'd have better fruit, and it would be so much better for us because the operation, the labor, would be cut in half; we could do it ourselves, we wouldn't have to hire any help except for the thinning and the picking. I reasoned with them, said this is a foolish time to pull trees, this is no time to pull trees, the price is good, it will probably be good; you've got the same acreage to cultivate, got the same acreage to disk, you've got the same acreage to pull your spray hose nozzle over. I says, it is foolishness to pull trees and I won't pull them. . . . A. And Austin, he warmed up a

little bit to the occasion and he said, now, Herb, he says, I know it will be better for you and it will be better for me if you pull those trees. He says, if you pull them, if you pull half of those trees, we'll trim them up, take the stumps off the orchard and the wood will be ours; otherwise we won't farm it. And I reasoned with him again, I tried to plead with him about the price of the fruit being good, that is the time to make it when you can get production. No, we don't want any of it; we will not buck that deal again; we have had too much grief. Q. Did they say anything about how excessive the costs were? A. Yes, they said the costs were so excessive and the labor was so high, so much spray material needed on the place, and they hadn't made anything, and that they really could make more if they'd go out on a construction job.

"Q. Was anything said about their having watched newspaper ads to see if any other places were for sale? A. Yes, they said, we've been looking around. We'd rather have a diversified ranch. We like stock. We don't have the manpower condition to buck in stock we have in this orchard deal. And they said, Scotty is coming down, we may go to Honolulu, may go out on a construction job sometime. We're going to wait until he comes down and talk with him. Scotty was a brother-in-law that was somewhere in the Aleutians. Aus has been a construction man. That is what they were reasoning at that time. Well, then, I said, Aus, I won't pull the trees. I tell you what I'll do. I will sell you the place for $12,500.00, then you can pull the trees, leave them, do whatever you want with them. Margaret spoke up, said, Herb, we'll probably buy a place but it won't be that one. And the conversation drifted on, we were eating our dinner, drifted back and forth. Then I said, Aus, if I pulled those trees and prepared the ground, raised a cover crop in the old holes and planted a new orchard, would you raise those trees? Margaret spoke right up and she says, we'd be glad to; we would be glad to raise those trees. I didn't raise the trees. I said, would you irrigate and care for the trees? And she says, we'll make a one year deal, one year at a time, on these terms; two-thirds of the crop, the same crop— the same crop division as the previous year; we'll make a one, a year to year deal. If you're satisfied with us and we're satisfied and don't want—and want to stay, we would like the privilege of having the first chance at renting the place. Said, just as soon stay here year to year, so long as we've got to live somewhere, we might as well live here. I answered and said, all right, I'll pull half of the trees."

Margaret's testimony as to what occurred at the Golden Wheel was, in part, as follows:

"The conversation was that we were going to leave the place, we were thinking of leaving the place, and he [Herb] wanted to know why, and we said that we thought we had given it a fair trial and that we had actually gone behind, and my husband's health—in the meantime, I had had one thing that brought us to that decision; I had had my husband to a specialist in Seattle, and he said that he mustn't do hard work or worry. . . . So, on the 16th of January, we told him [Herb] we believed we would leave the place, and he asked us why, and we said we hadn't made even wages on the place, and that my husband was not able to operate a large place, it is twenty acres, and that we believed that a ten-acre place would be more what we could operate; and right away, he said, no, don't leave it. . . . And I definitely said to him that twenty acres was just more than we could operate. . . . He says, if I would pull half of the trees out and make a ten-acre place, you could operate that fine, couldn't you? And I said, yes, I thought we could. So he said, he said that he would make it easy on us."

Margaret further stated that Herbert said he would put in a pipe line, fix up the road, and take out half the trees, so they went ahead with the work. We quote further from her testimony:

"Q. On this January 16th date, was there any discussion there about a purchase or taking up the option? A. Yes. At that time, Herb says to us, he says, 'Why don't you buy the place?' And I said to him, well, I said, we really don't want a 20-acre place, we want a 10-acre place. And Austin said to him, he said, well, what would you have to have, Herb, for the place? And he said, I want twelve thousand five hundred. And Austin said, well, that's a little high, isn't it? And Herb said, well, I tell you, he says, I'll take off the air compressor and the cat., and you can have it for twelve thousand. And we didn't make no comment. We didn't take up the—buy it, say that we'd buy it."

Margaret further stated that there was nothing said about limiting the lease to one year; that the lease had been signed by appellants at that time. Her testimony in regard to signing the lease is, in substance, as follows: that appellants

signed both copies of the lease the first part of September, 1944, and put them in the back of the car on the ledge, with the intention of taking them to Herbert; that they went to Herbert's place, but forgot to give him a copy of the lease; that the copies of the lease remained in the car for about three weeks, until finally one day Margaret was cleaning out the car, took them out and put them in a dresser drawer; that she never told Herbert the lease had been signed.

It is undisputed that Herbert never saw the lease from the time the copies were given to appellants on December 8, 1943, until May 28, 1945, when appellants made a tender of thirteen thousand dollars to respondents and claimed the right to exercise their option to purchase.

Ben Smith testified that early in 1945, while he and Jerry Westmoreland were working on the Gromore place, he had a conversation with Margaret, in which the lease of December 8th came up; that Margaret said the lease was no account; that upon Smith asking her what was the matter with it, she replied that Thelma had signed it before Herb did; that he (Smith) then asked Margaret to show him the lease, which she did; that the only signatures on the lease were those of Thelma and Herbert. Smith further testified that he told Margaret the lease was no good because it had not been signed, to which Margaret replied: "I know it ain't, and I ain't going to sign it."

Jerry Westmoreland, who was present during the conversation last above mentioned, stated it occurred the last part of January or first part of February, 1945. This witness did not actually look at the lease, but testified to the conversation as being in substance as stated by Ben Smith. Margaret denied that any such conversation ever took place.

After the conversation in the Golden Wheel on January 16, 1945, Herbert and Austin went through the orchard, and Herbert prepared a chart of the trees which were to be taken out. One row of trees was actually cut, at which time Herbert discovered that, under his contract with the Urquharts, he could not cut the trees. Apparently, this information was conveyed to appellants by some of Herbert's men who were working at the Gromore place, and, as a re-

sult of this information, Austin and Margaret went to see Herbert about the first week in March. Present on this occasion were appellants and respondents, a sister of Austin and Herbert's, and Helen, the eighteen-year-old daughter of respondents. The following is the material part of this conversation, as testified to by Herbert:

"The question was asked, Herb, Margaret says, Herb what I want to know is this, are you going to pull those trees or not? And I says, no, Margaret, we're not going to pull those trees. I've got a contract with Urquhart in which I'm not permitted to remove or destroy any of the property, and I had not the permission to pull those trees, so we're not going on with it. She answered, well, that's all there is to it then. We're through; we won't buck that deal again like we did last year."

The parties then discussed the price of apples, and Margaret stated that Herb never intended to pull the trees; that it was just a ruse on his part to saddle appellants with the place again. Herbert's statement continues:

"We discussed the price of apples again and finally Austin spoke up and says, Herb, if we farm the place again, there ought to be some changes. If we continue with this, there ought to be some changes. And I wanted to know what they were. And Austin says, you ought to haul your third of the crop. I says, that is all right, but, Aus, you should furnish your power to pull them apples out of the orchard. And he agreed that that was all right. And then Margaret took the conversation—"

After some further discussion, Margaret brought up the question of boxes for the fruit.

"She says, that is the only thing, that box deal is the only thing I'm afraid of. I says, Margaret, I'll give you one concession. I will guarantee—you get all the boxes you can and I'll guarantee to furnish you enough boxes to harvest that crop."

Margaret denied that much of the conversation related by Herbert ever took place. She specifically denied that Herbert told them the reason he could not take the trees out. She stated that this meeting was on a Friday night; that Herbert was to come to their place the next Sunday to

further discuss matters; and that Herbert and his family did come the next Sunday. Herbert and his wife denied that they went to Austin's on that Sunday.

The substance of Margaret's testimony as to what she stated relative to giving up the place was that, after Herbert told them he was not going to pull any more trees, they were undecided what to do, that is, whether they would give up the place or not; that they wanted a few days to think it over. She stated that the conversation about the boxes occurred on the next Sunday, when Herbert and his family came to their place, not on the Friday night. Austin testified that on the Friday night referred to, the lease was not mentioned.

The next conversation between the parties occurred about May 15, 1945, at Herbert's home, at which time, according to Herbert's testimony, the following occurred:

"Margaret says, Herb, figure up your bill, we want to buy the place. And I said, Margaret, I haven't any place to sell. She spoke up and says, we've got papers that say you've got a place that we can buy. Well, I says, I never had any paper that said I had a place I had to sell to you people. And she says, We've got it, and we want to buy it. Well, I says, listen, I haven't any place to sell. And she says, well, you offered to sell us that place for $12,500.00 in January. I says, I know it, and you trimmed it down, said you didn't want any of it. If I wanted to sell that place, I have got a standing offer of $15,000.00 for it. She spoke right up and says, we'll give you $15,000.00 if that is the way you have to deal. I says, no, I told you once or twice I don't have a place to sell."

Margaret's version of this conversation was that they told Herbert they believed they would take up the option; that Herb became angry and told appellants they had no lease and no option.

It may be stated here that the testimony shows that, at the time appellants indicated they desired to buy the place or take up the option which they claimed they had, there was going to be an unusually large crop on the orchard, and that, due to crop conditions and other factors, the price of apples would be high.

The next conversation between the parties prior to the time this action was instituted was on May 28, 1945, at which time appellants went to Herbert's place and offered respondents thirteen thousand dollars in cash for a deed to the place. Herbert counted the money and gave it back. Appellants left a copy of the lease with Herbert before they left after the above conversation, and this was the first time he had seen the lease since the two copies had been given to appellants in December of 1943.

According to Margaret, appellants again went to Herbert's on May 31st for the purpose of trying to effect a settlement, but again Herbert refused to recognize that they had an option to purchase the place.

As shown by the memorandum opinion, the court concluded that it was doubtful if appellants signed the lease in September, as testified to by them, and we are in accord with the conclusion of the trial court. In fact, when all the evidence is considered, we think it preponderates against appellants' contention that the lease was signed by them in September, 1944.

It is contended by appellants that it was not necessary for them to sign the lease in order to make it a binding contract, but that it became a binding contract when signed by respondents and when appellants, as lessees thereunder, went on the ranch and proceeded to farm it in accordance with the terms of the lease. Appellants cite *Starwich v. Washington Cut Glass Co.*, 64 Wash. 42, 116 Pac. 459, Ann. Cas. 1913A, 262, and other authority to sustain their contention.

█ As a legal proposition, the above contention of appellants may be admitted, but it is an established principle of law which needs no citation of authority that, before appellants would be entitled to claim or exercise the right to purchase under the option, they must establish that the lease containing the option was in full force and effect at the time they attempted to exercise the option. We are impressed with the fact, as was the trial court, that on each occasion when the lease was discussed, beginning with De-

cember 8, 1943, until the meeting on May 16, 1945, appellants expressed dissatisfaction with the lease and their intention not to be bound by it. We have related these occasions, first on December 8, 1943, then in Austin's bedroom in May, 1944, later in the Golden Wheel restaurant, and finally in March, 1945.

█ We are of the opinion there is substantial testimony to support the trial court's conclusion that at all times from December, 1943, until May 16, 1945, appellants took the position that the lease was not binding on them, since they seemed to be of the opinion they could leave the place at any time. In other words, they did not recognize that they were bound by the five-year lease. We quote from the memorandum opinion:

"It seems to the court that the conduct of the plaintiffs through all that period was inconsistent with their present contention that the lease had been accepted and acted upon by them, because (1) it is, at best, doubtful if they had ever signed the leases during that period; (2) even though signed, both copies of the lease remained in their possession and were never delivered to the defendants; (3) their several times repeated intention of giving up the ranch was in conflict with their present contention that the lease had become binding, because if it were so, the plaintiffs were under obligation to continue on the ranch and to farm it for the balance of the five year period, or to respond in damages if they failed to do so."

We are also impressed, as was the trial court, with the fact that it was the prospect for a large 1945 crop, high prices for apples, and increased value of the land which induced appellants to contend that the lease of December 8, 1943, had at all times been in effect, and that it was under that lease that they had operated the ranch. We quote again from the memorandum opinion:

"The court concludes, therefore, that there was never an acceptance of the proposed written lease by the plaintiffs and that it, therefore, never became the contract of the parties, so as to make its term providing for the right to purchase at the option of the lessees specifically enforcible by them."

We are of the opinion that there is ample evidence to support the statement of the trial court last above quoted and the judgment entered; and therefore the authority cited by appellants, to which we have referred, is not applicable.

In view of our conclusion as above indicated, it becomes unnecessary to pass upon the question of whether or not the terms of the option are so uncertain and indefinite that an action for specific performance will not lie.

For the reasons herein assigned, we are of the opinion the judgment of dismissal entered in this action must be and it is affirmed.

MALLERY, C. J., STEINERT, ROBINSON, and HILL, JJ., concur.