[No. 38832-4-II.   Division Two.   April 27, 2010.]

Ledaura, LLC, *Respondent*, v. Randy Gould et al.,
*Appellants*.

---

*Mark R. Roberts* (of *Roberts Johns & Hemphill PLLC*), for appellants.

*Douglas N. Kiger* (of *Blado Kiger PS*), for respondent.

¶1 HUNT, J. — In this action to enforce an option agreement to purchase real property, business partners Bret Drager and "Jane Doe" Drager, Greg Johnson and "Jane Doe" Johnson, and Randy Gould and "Jane Doe" Gould (Buyers)[1] appeal the trial court's denial of their motion for summary judgment and its grant of partial summary judg-

---

[1] Although this dispute involves both a lease and an option to buy real estate, we refer to Drager, Gould, and Johnson (and their marital communities) collec-

ment in favor of seller Ledaura LLC. Buyers argue that the trial court erred in finding that the parties' separate lease and option agreements formed a single contract and that terminating the lease agreement also terminated the option agreement. We reverse the trial court's grant of partial summary judgment to Ledaura and remand.

## FACTS

### I. LEASE, OPTION, AND ADDENDA

¶2 Leah Caruthers and her sister formed the David W. Smith Revocable Living Trust (Trust) to manage their father's assets after he suffered a stroke in December 2004. The sisters served as cotrustees. Between November 2005 and January 2006, Buyers negotiated with the Trust to lease two adjacent lots and a commercial warehouse (Property) in the city of Tacoma's St. Helen's neighborhood. With assistance from their real estate agents, Buyers and Caruthers[2] negotiated an eight-year lease agreement, which they signed on December 2005 and extinguished shortly thereafter.

### A. January 24, 2006 Lease and Lease Addendum

¶3 Next, Caruthers negotiated and Buyers drafted a new three-year lease agreement (Lease), which the parties executed on January 24, 2006. The Lease identified Buyers as "Tenants" and the Trust as "Landlord," set the rent at $4,500 per month, and required Buyers to "prepay" $9,000 rent for the first and last months. The Lease provided: (1) "Tenants shall not assign" or transfer their interest in the Lease without the landlord's consent, Clerk's Papers (CP) at 166; (2) "This Lease contains all of the covenants and agreements between Landlord and Tenant relating to the

tively as "Buyers," rather than "tenants," because enforceability of the option is the focus of this appeal.

[2] Caruthers negotiated the agreements with Buyers on the Trust's behalf.

Premises. No prior or contemporaneous agreements or understanding pertaining to the Lease shall be valid or of any force or effect . . . ," CP at 171; (3) "Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision of this Lease," CP at 171; and (4) "The following exhibits and riders are made part of this Lease[:] Exhibit A-Legal Description[,] Exhibit B Addendum DATED January 24th, 2006." CP at 172.

¶4 On the same day that the parties signed the Lease, they also executed a "LEASE ADDENDUM." CP at 24. This Lease Addendum provided as follows: (1) The Trust "shall not alter the Lease Agreement or any other real estate related agreements (The 'Agreements') without the express written permission of (Lessee) [Gould, Drager, and Johnson]"; (2) "Tenant [Lessee] shall have months (2) through (11) of the first year of the lease free of rent"; (3) "Lessee retains the option to renew the lease with all terms and conditions outlined in Agreements remaining the same (with the exception of a free rent provision) for a period of up to (5) years"; and (4) "[t]his agreement supersedes all previous agreements." CP at 24.

## B. January 25, 2006 Option To Buy, Purchase and Sale Agreement, and Addendum

¶5 The next day, on January 25, the parties signed an agreement entitled "OPTION TO BUY REAL ESTATE" (Option), for which Buyers paid $35,000 in consideration for an option to buy the Property for $1,060,000. CP at 186. The Option neither mentioned the Lease nor referenced any Lease terms.

¶6 The Option provided:

In consideration of: $35,000 paid by Buyer to Seller; Seller grants to Buyer, and Buyer's successors and assigns, the right to buy the Property on or before the 25th day of January, 2014, (the 'expiration date') without grace or extension of said date.

CP at 186. Unlike the Lease, which prohibited Buyers from assigning their interest in the Lease, the Option provided for "Buyer, *and* Buyer's successors and assigns." CP at 186 (emphasis added). The Option further provided:

> Buyer may exercise this Option, only by written notice delivered or sent (postmarked) by certified mail, to Seller . . . at least thirty (30) days in advance of the expiration date of this Option.

CP at 186. The Option also provided that the property's legal description was "[a]ttached." CP at 186.

¶7 The Option's "OTHER AGREEMENTS" provision noted only two items—a purchase and sale agreement and an addendum. The Option provided:

> Buyer and Seller have completed and attached a Purchase and Sale Agreement. If Buyer exercises this Option, Buyer and Seller agree to proceed with the transaction according to the terms and conditions set forth [i]n the attached Purchase and Sale Agreement.

CP at 186. This standard form purchase and sale agreement, which the parties signed on the same day as the Option, contained much of the same information as the Option, including the purchase price, the $35,000 "earnest money" payment, and the January 25, 2014 expiration date for exercising the Option. CP at 176. In contrast to the Lease but like the Option, the purchase and sale agreement provided, "Buyer may assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent, unless provided otherwise herein." CP at 182. The purchase and sale agreement also identified the property as "601 Saint Helens" in Tacoma, Washington, "legally described on attached Exhibit A." CP at 176. And it included in its "POSSESSION" provision that "[b]uyer shall be entitled to possession, subject to existing tenancies (if any), SEE Attached Lease[3] (on closing, if not completed)." CP at 180.

¶8 Under "EXHIBITS AND ADDENDA," the purchase and sale agreement listed 10 documents, including Buyers'

---

[3] The words "SEE Attached Lease" were handwritten in a blank space on the purchase and sale agreement. CP at 180.

earnest money promissory note and the Property's deed of trust. CP at 177. Another handwritten note listed the following additional documents: "Option to Purchase 1-25-06, Lease Agreement 1-24-06, Purchase & Sale 1-25-06, Addendum 1-25-06, Revocable Trust 4-18-05 [and] Power of Attorney 4-18-05." CP at 177. Although the purchase and sale agreement twice referenced the parties' Lease agreement in handwritten additions to the printed document, it contained no information about whether this Lease affected the Option or vice versa.[4]

¶9 Also on January 25, the parties executed an "ADDENDUM," the heading of which included the Property's street address and the notation "Lease, Option to Buy Real Estate and Purchase and Sale Agreement" (January 25 Addendum). CP at 190. Although this January 25 Addendum contained much of the same information as the January 24 Lease Addendum, it provided several additional provisions, including: (1) "This agreement supersedes all previous agreements including the lease addendum dated January 24, 2006," CP at 24, 190 (No. 10); (2) "Earnest/Option monies ($35,000.00) provided pursuant to Agreements shall be either paid into escrow and shall be made available to seller upon request or directly to Seller within [three] weeks of mutual acceptance of Agreements," CP at 190 (No. 9); and (3) "Both the Buyer and Seller shall equally share the Listing commission of approximately $30,000 upon the successful completion of the sale of the property." CP at 190 (No. 11).

¶10 The January 25 Addendum also provided that the Trust

---

[4] This standard form purchase and sale agreement also included a provision for "Books, Records, Leases, [and] Agreements" under section 5(a). CP at 178. The provision read, "Seller shall make available for inspection by Buyer and its agents . . . all documents available to Seller relating to the ownership, operation, renovation or development of the Property, including . . . leases of personal property or fixtures; leases or other agreements relating to occupancy of all or a portion of the Property . . . ." CP at 178. Although this provision included a standard form reference to "lease agreements" in general, it did not refer to the parties' January 24 Lease; nor did it contain any language about whether this Lease, or any other agreement between the parties, affected the Option or vice versa.

shall have the exclusive right to occupy the bottom floor of the building rent free, except for expenses, for a period of up to (8) years or until [Smith's] demise, and shall be responsible for utilities, insurance, maintenance, repairs and net costs pertaining to the bottom floor only.

CP at 190 (No. 4).

¶11 In addition, the January 25 Addendum listed the following "Other Documents included herewith":

1. Exhibit A Legal Description

2. A copy of the David W Smith Revocable Living Trust dated April 18, 2005.

3. A copy of the "Durable Power of Attorney" designating Laura A. Kuhl and Leah Caruthers as co-attorneys-in-fact.

4. Lease Agreement dated January 24, 2006

5. Purchase and Sale Agreement dated January 25, 2006

6. Option to Buy Real Estate dated January 25, 2006.

CP at 190-91.

### C. Possession/Transfer of Property/Dispute

¶12 Shortly after executing these agreements, Caruthers formed Ledaura on February 16, 2006 and transferred ownership of the Property from the Trust to Ledaura. In January, Buyers took actual possession of the Property under the Lease. They occupied the upper and middle floors of the warehouse as tenants and began making significant improvements to the building by demolishing and removing old walls, building an office, painting the exterior, and repairing the water system, glass panels, and garage doors. According to Buyers, the value of these improvements exceeded $100,000.

¶13 In 2007, a dispute arose about the rent owed under the Lease. During the parties' negotiations to resolve the dispute, Ledaura proposed a new addendum, which provided, "Tenants have the option to purchase the property on the terms set forth in the . . . Purchase and Sale Agreement

so long as there has been no default at any time in their obligations under the lease, option, or any addenda thereto." CP at 80-81. Buyers rejected this proposal, believing it would jeopardize their ability to exercise their 2006 Option to buy the property. Thus, this proposed additional addendum making exercise of the purchase Option contingent on Lease performance was never agreed on or signed.

¶14 Having failed to resolve the rent dispute, Ledaura served Buyers with a "Notice to Pay Rent or Vacate and Notice Terminating Option" on July 30, 2007. CP at 6, 41-42. The notice (1) advised Buyers that they had defaulted on rent payments for six consecutive months (February-July 2007); (2) directed Buyers to pay the outstanding sum within five days or to vacate and to surrender the property; and (3) stated, "EVEN IN THE EVENT THAT PAYMENT IS MADE you are hereby notified that your option to purchase the property is hereby terminated." CP at 42.

¶15 On August 10, Buyers responded to Ledaura by letter, asserting that it had failed its landlord obligations to keep the building "free of debris and broom swept clean," to maintain the structure in "good condition and repair," and to remove hazardous materials and other debris. CP at 71. The letter also noted, (1) "[U]ntil the landlord [Ledaura] complies with its obligations, the tenant [Buyers] is under no obligation to pay rent," CP at 71; and (2) Buyers were prevented from securing subtenants by Ledaura's refusal to perform its obligations and to consent to building permits that Buyers had requested for building improvements.

II. PROCEDURE

A. Unlawful Detainer Action

¶16 Ledaura filed an unlawful detainer action against Buyers. Sitting without a jury, the trial court found that Buyers' lease term commenced in June 2006, and that they had breached the Lease by failing to pay rent owing from

June 2007 to February 2008. The trial court concluded that Buyers "are in unlawful detainer and are not entitled to possession of the Property," CP at 153, and ruled that the Lease "is hereby forfeited." CP at 157. Buyers appealed.[5]

## B. Declaratory Relief Action

¶17 While the unlawful detainer appeal was pending, on June 2, 2008, Buyers sent Ledaura a written "NOTICE EXERCISING OPTION TO BUY REAL ESTATE" for $1,060,000. CP at 46. The notice provided that (1) Buyers would use their $35,000 payment for the Option as earnest money toward the Property's purchase price; and (2) in accord with the Option's assignment provision, Buyers could assign the Option to another party before the January 25, 2014 closing date.

¶18 Ledaura refused to accept payment for the property or to recognize the Option as an enforceable agreement. Instead, it filed a "COMPLAINT FOR DECLARATORY RELIEF OR, IN THE ALTERNATIVE, BREACH OF CON-TRACT AND DAMAGES" against Buyers. CP at 3. The Complaint alleged that the Option was not enforceable because, after the trial court ruled in Ledaura's favor in the earlier unlawful detainer action, Buyers failed to exercise their right to avoid forfeiture of the Lease under RCW 59.12.190.[6]

¶19 In response to Ledaura's complaint, Buyers denied Ledaura's allegations and counterclaimed for specific per-formance of the Option, asking the trial court to dismiss Ledaura's complaint with prejudice and to enforce Le-daura's obligations under the Option, or, alternatively, to award damages to Buyers for Ledaura's breach. Ledaura filed an "ANSWER TO COUNTERCLAIMS AND AFFIR-MATIVE DEFENSES," asking the trial court to dismiss

---

[5] On April 14, 2009, we affirmed the trial court's ruling that Buyers "[we]re in unlawful detainer." CP at 153; *see* Br. of Resp't, App. B.

[6] Under RCW 59.12.190, a tenant may apply for relief from lease forfeiture within 30 days of the trial court's declaration of forfeiture in its judgment.

with prejudice Buyers' counterclaims and to grant the relief requested in its complaint.

¶20 Buyers moved for summary judgment, asking the trial court to declare the Option enforceable and to order Ledaura to comply with the Option's terms. Buyers argued that none of their agreements with Ledaura indicated that terminating the Lease would also terminate the Option because the Option was separate and independent from the Lease and supported by separate consideration.

¶21 Ledaura moved for partial summary judgment on the Option's enforceability. Ledaura argued that the Lease and Option agreements incorporated each other by reference and, therefore, that "THEY SHOULD BE TREATED AS A SINGLE AGREEMENT, AND A BREACH OF ONE SHOULD BE CONSIDERED A BREACH OF ALL." CP at 97. In the alternative, Ledaura argued that if the Option were separate from the Lease, the Option would be unenforceable under the statute of frauds: Ledaura reasoned that, unlike the Lease, which included the property's legal description in "attached Exhibit A," CP at 111, the Option, which similarly noted the property's legal description as "Attached," CP at 129, lacked the requisite legal description for the property. Buyers responded that Ledaura's legal authorities were inapposite.[7]

¶22 In a letter ruling, the trial court granted partial summary judgment to Ledaura, reasoning:

This is a challenging case, and will likely be resolved by the appellate court. The language that would have made it an easy case to resolve is missing from the agreements, namely language requiring the lessee to be in compliance with all lease terms in order to exercise the purchase option. However, I believe that the option and lease are so intertwined to find that

---

[7] Buyers also filed written declarations from Gould and Johnson. In Gould's declaration, he asserted that Caruthers' complaint about using an unlicensed contractor "ignores the fact that she hired Mr. Monroe to perform the work in the building for her, both before and after the demolition work was performed." CP at 294. In Johnson's declaration, he denied Caruthers' allegation that he had pressured her into firing her real estate agent.

the intent of the parties was to require that the lease be in full force and effect in order for the option to be exercised in the future. The addendum to the option agreement is replete with references to the lease and supports [Ledaura's] position.

I believe that the breach of the lease, as found by Judge Lee, terminates the option to purchase the real property and will grant the plaintiff's motion for summary judgment. If the appellate court finds that the lease was not breached, then the option to purchase would still be in effect.

CP at 398.

¶23 In its "order on cross motions for summary judgment," the trial court incorporated by reference its letter decision and denied Buyers' motion for summary judgment. CP at 403. The trial court determined under CR 54(b) that "[t]here is no reason to delay resolution of this matter in the meantime and waiting [for the appellate court decision] will impose a substantial hardship on the parties." CP at 403-04. It further noted that its decision "will necessarily require the parties to wait for a decision from the Court of Appeals in the unlawful detainer case and if the Appellate Court determines that [Buyers] are in breach of the Lease, it is highly probable that [Buyers] will appeal this decision." CP at 403.

¶24 Buyers appeal.

## ANALYSIS

### I. PURCHASE OPTION INDEPENDENT FROM LEASE

¶25 Buyers argue that the trial court erred in granting summary judgment to Ledaura based on its erroneous conclusions that (1) absent the Lease, the Option was unenforceable because the parties intended the Lease to "be in full force and effect in order for the [O]ption to be exercised in the future"; and (2) Buyers' failure to pay rent breached the Lease, which implicitly terminated the Option. CP at 398. Agreeing with Buyers, we hold that neither the Option nor the Lease expressly provide or imply

that the Option's enforceability is contingent on Lease performance.

## A. Standard of Review

■ ¶26 We review summary judgment de novo, engaging in the same inquiry as the trial court and viewing the facts and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *Associated Petroleum Prods., Inc. v. Nw. Cascade, Inc.*, 149 Wn. App. 429, 433, 203 P.3d 1077, *review denied*, 166 Wn.2d 1034, 217 P.3d 782 (2009). Summary judgment is proper when no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law. *Diamond "B" Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App. 157, 161, 70 P.3d 966 (2003). "In the contract interpretation context, summary judgment is improper if the parties' written contract, viewed in light of the parties' other objective manifestations, has two or more reasonable but competing meanings." *Diamond "B" Constructors*, 117 Wn. App. at 161 (citing *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 10, 937 P.2d 1143 (1997)).

■■ ¶27 The goal of construing a contract is to determine and to effectuate the parties' mutual intent. *Hall*, 87 Wn. App. at 7. Interpreting the meaning of a contract provision is primarily a question of fact. *Martinez v. Kitsap Pub. Servs., Inc.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999) (citing *Denny's Rests., Inc. v. Sec. Union Title Ins. Co.*, 71 Wn. App. 194, 201, 859 P.2d 619 (1993)). Nevertheless, contract interpretation involves " 'a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence.' " *Martinez*, 94 Wn. App. at 943 (quoting *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996)).

■■ ¶28 "When analyzing the parties' intent, a court must examine not only the four corners of any writing the parties may have signed, but also the circumstances lead-

ing up to and surrounding the writing," for which extrinsic evidence is admissible. *Hall*, 87 Wn. App. at 8 (citing *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990)). In considering the circumstances surrounding the agreement, courts examine the parties' objective manifestations of intent, but not their unilateral or subjective purposes and intentions about the meaning of what is written. *Hall*, 87 Wn. App. at 9. In other words, we "strive[ ] to ascertain the meaning of what is written in the contract, and not what the parties intended to be written" but did not memorialize. *Bort v. Parker*, 110 Wn. App. 561, 574, 42 P.3d 980, *review denied*, 147 Wn.2d 1013, 56 P.3d 565 (2002).

### B. No Cross-Referencing between Option and Lease

¶29 Ledaura contends Buyers' breach of the Lease terminated their Option to purchase the Property, citing *Rademacher v. Rademacher*, 27 Wn.2d 482, 178 P.2d 973 (1947); *Esmieu v. Hsieh*, 20 Wn. App. 455, 580 P.2d 1105 (1978), *aff'd*, 92 Wn.2d 530, 598 P.2d 1369 (1979); and *Kaufman Brothers Construction, Inc. v. Estate of Olney*, 29 Wn. App. 296, 628 P.2d 838 (1981). We disagree. As Buyers correctly note, these cases do not apply here because all involve a lease-option agreement in which the lease itself includes an option-to-buy provision. *Rademacher*, 27 Wn.2d at 483; *Esmieu*, 20 Wn. App. at 457; *Olney*, 29 Wn. App. at 297.

¶30 Here, in contrast, the separately titled, dated, and signed[8] Lease contains no implicit or explicit reference to the purchase Option, for which Buyers paid separate consideration. Nor does the Option expressly reference or incorporate the Lease, which the parties had executed the day before. Moreover, the Option's provision for "OTHER AGREEMENTS" does not include the Lease signed one day

---

[8] As Buyers correctly note, (1) The parties executed the Option "in a document entirely separate from the Lease"; (2) Buyers paid $35,000 as separate consideration for the Option; and (3) unlike the Lease, the Option gave Buyers the unrestricted right to transfer or to assign the Option without Ledaura's consent. Br. of Appellant at 10. Ledaura does not dispute these points.

earlier. CP at 130. Rather, this Option provision lists only the Option's purchase and sale agreement and the January 25 Addendum.

### 1. "Missing" language

¶31 Although ruling that the Option was subject to the Lease, the trial court expressly noted the lack of supporting language:

> The language that would have made it an easy case to resolve is *missing* from the agreements, namely language *requiring the lessee to be in compliance with all lease terms in order to exercise the purchase option.*

CP at 398 (emphasis added). Nevertheless, the trial court essentially read this missing requirement into the Option when it concluded that "the option and lease are so intertwined . . . that the intent of the parties was to require that the lease be in full force and effect in order for the option to be exercised in the future." CP at 398. Moreover, the trial court recited no circumstances surrounding the execution of these two agreements to support its conclusion about the parties' intent that the Option was subject to fully compliant performance of the Lease.

¶32 On the contrary, on May 22, 2007, approximately 16 months after executing the Lease and Option agreements with Buyers, Ledaura proposed an addendum to the purchase Option that contained the language that the trial court had characterized as "missing" from the Option: "[Buyers] have the option to purchase the property . . . so long as there has been no default at any time in their obligations under the lease, option, or any addenda thereto." CP at 80-81, 398. That Ledaura specifically proposed adding this provision underscores the absence of any Lease compliance requirement from the Lease and the Option.[9]

---

[9] The Option's purchase and sale agreement's inclusion of two passing references to the Lease, without more, does not establish the parties' unwritten

¶33 Thus, a question of material fact remains as to whether the parties intended that Buyers' ability to exercise the purchase Option would depend on their satisfaction of the Lease. *Diamond "B" Constructors*, 117 Wn. App. at 161. Because reasonable minds could differ on this issue, we hold that summary judgment was improper.

### 2. Caption of January 25 Addendum

¶34 In addition, we hold that the trial court's reliance on the January 25 Addendum to support its summary judgment ruling was misplaced. *See* CP at 398. Although the January 25 Addendum's heading includes the words "Lease[,] Option to Buy[,] and Purchase and Sale Agreement," its body's text does not modify the Option or otherwise connect it to the Lease. CP at 190. The January 25 Addendum's heading includes both the Lease and the Option; but this heading, without more, does not show that the purchase Option was contingent on fulfilling the Lease terms. Thus, the trial court erred in relying on the January 25 Addendum to justify summary judgment for Ledaura.

### C. Relationship between Agreements

¶35 Nothing in the record demonstrates the parties' intent that Buyers' right to exercise the Option to buy the Property would be contingent on their performance under the Lease. Nonetheless, we recognize the following indicia of some relationship between the Lease and the Option: These agreements were executed on consecutive days, by the same parties, concerning the same Property; and, as Ledaura argues, the Option's purchase and sale agreement and addendum expressly refer to the Lease and Exhibit A, which contains the Property's legal description.[10] But these

---

"intent" that Buyer's ability to exercise the purchase Option was to be contingent on their satisfaction of the Lease terms. CP at 398.

[10] This cross-reference demonstrates a limited relationship among the Lease, the Option, the purchase and sale agreement, and their associated addenda, even though these documents are sufficiently independent to be severable. Accordingly,

cross-references, without more, do not show that the parties intended that these two agreements would be interdependent to the extent that they would form or operate as a single, unified contract.

¶36 We have found no Washington case analyzing whether a lease and a purchase option for the same property constitute a single agreement. But we find persuasive a factually analogous case from the Texas Court of Appeals, *Walker v. Horine*, 695 S.W.2d 572 (Tex. Ct. App. 1985). Walker and Retama Manor Nursing Centers, Inc., simultaneously executed a 15-year, 3-month lease agreement and an option agreement to purchase the leased property. *Walker*, 695 S.W.2d at 574. The option agreement (1) "gave Retama [as buyer and lessee] an option to purchase the leased property from Walker at any time after the end of the sixty-third month of the initial term of the lease at a price of $530,000"; and (2) provided "that the option shall run concurrently with the contract of lease agreement." *Walker*, 695 S.W.2d at 574. There was no language, however, making enforceability of the option contingent on performance of the lease. Six years into the lease term, Retama assigned the option agreement to Horine; but when Horine tried to exercise the option, Walker refused to sell the property. *Walker*, 695 S.W.2d at 574. The trial court granted Horine's motion for specific performance of the option. Walker appealed, arguing, inter alia, that (1) the parties had intended the lease and option to form a single agreement; and (2) because the assignment clause in these two agreements "[we]re in contradiction," creating a factual question for the jury about the parties' intent, the trial court's order on summary judgment was improper. *Walker*, 695 S.W.2d at 575.

¶37 Rejecting Walker's argument, the Texas Court of Appeals affirmed the trial court's order for specific performance of the option, stating,

---

we do not reach Ledaura's alternative argument that even if the Option were separate and independent from the Lease, the Option would not be enforceable because it contains no legal description of the property, as the statute of frauds requires. RCW 64.04.010.

Although executed on the same day, they [the agreements] are not necessarily part of the same transaction because each agreement gives the parties separate benefits as well as separate obligations. The lease agreement provides for assignment with prior written permission of the lessor. No similar written provision exists in the option agreement[, which provides] that its benefits will inure to the assigns.

*Walker*, 695 S.W.2d at 577.

¶38 The Texas court also concluded that the option's reference to a lease exhibit containing the legal description satisfied the statute of frauds:

Here, the option agreement is in a separate writing which is signed by both parties. There is no allegation of record that it was not supported by consideration. It is dated and states the price of the land. It refers to exhibit A of the lease for a description of the land. This is sufficient to describe the land under the statute of frauds because *the option agreement document furnishes within itself the means by which the property could be identified with reasonable certainty.*

*Walker*, 695 S.W.2d at 576 (emphasis added).

¶39 Adopting the foregoing *Walker* analysis, we hold that Ledaura failed to demonstrate that the parties intended the Lease and Option to operate as a single contract. As in *Walker*, the parties' Option and Lease here are separate agreements in both function and form. The parties drafted and incorporated these agreements in physically separate documents, which they signed separately. And the parties supported each agreement with an independent source and amount of consideration: $9,000 of prepaid rent as consideration for the Lease, and $35,000 as consideration for the Option. As *Walker* discussed, that each agreement "gives the parties separate benefits as well as separate obligations," 695 S.W.2d at 577, supports that the Lease and Option were not implicit parts of the same contract.

¶40 Furthermore, here, as in *Walker*, the parties' Option and Lease agreements contained contradictory assignment

clauses. Here, the Lease provided, "[Buyers/][t]enants shall not assign" or transfer their interest in the Lease without the landlord's consent. CP at 166. In contrast, the Option specifically provided for "Buyer's successors and assigns," CP at 186; and the Option's attached purchase and sale agreement provided, "Buyer may assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent." CP at 182. Although the parties executed the agreements, which concern the same subject Property, on consecutive days, the agreements' contradictory assignment provisions underscore that the parties executed the Lease and the Option for different reasons, that each agreement contains a separate and distinct set of promises, and that the Lease and Option are two separate instruments. *Walker*, 695 S.W.2d at 577.[11]

¶41 We also adopt *Walker*'s rationale for our statute of frauds analysis here. As in *Walker*, the Option's reference to the Property's legal description as "Attached," apparently referring to exhibit A of the Lease, "is sufficient to describe the land under the statute of frauds because the option agreement document furnishes within itself the means by which the property could be identified with reasonable certainty." *Walker*, 695 S.W.2d at 576.

¶42 Although the parties executed the Lease and the Option on consecutive days and for the same Property, each agreement gives the parties separate benefits as well as separate obligations. There is no express language in either

---

[11] Although the parties do not raise a severability issue in their appellate briefs, we note that the general rule for severability in Washington supports Buyers' argument that the Lease and Option are separate agreements because the parties supported each of these agreements with separate consideration. *See, e.g., Saletic v. Stamnes*, 51 Wn.2d 696, 699, 321 P.2d 547 (1958) (quoting *Traiman v. Rappaport*, 41 F.2d 336, 338 (3d Cir. 1930) ("As a general rule a contract is entire when by its terms, nature and purpose, it contemplates and intends that each and all of its parts are interdependent and common to one another and to the consideration.")); *Carmack v. Drum*, 27 Wash. 382, 387, 67 P. 808 (1902) ("It is the consideration to be paid, and not the subject or thing to be performed, that determines the class to which a contract belongs. Its entirety or separableness depends not upon the singleness of its subject or the multiplicity of the items composing it, but upon the entireness of the consideration, or its express or implied apportionment to the several items constituting its subject.").

agreement indicating that the parties intended the agreements to function interdependently; nor do we find any support in the record implying that the parties intended to treat the Lease and the Option as a single agreement. Thus, the record fails to support the trial court's conclusion that these separate agreements are part of a single unified contract. *Walker*, 695 S.W.2d at 577.

### D. Judicial Estoppel

¶43 Lastly, Ledaura asserts that the doctrine of judicial estoppels prevents Buyers from asserting that the Lease and the Option are separate agreements in this declaratory relief action because they "previously maintained that the documents constitute one agreement" in the related unlawful detainer trial. Br. of Resp't at 4. This assertion is factually incorrect.

¶44 To support its argument on this point, Ledaura cites its trial counsel's November 11, 2008 declaration, which contains several paragraphs of dialogue quoted from the unlawful detainer trial. The record before us does not support this assertion. First, the record on appeal includes no portion of the transcript from the unlawful detainer trial. Second, the portions of transcript incorporated into trial counsel's declaration fail to provide the context in which they occurred. Thus, these portions of the record are not properly before us and we do not consider them. RAP 10.3(a)(5), (6).

### II. ATTORNEY FEES AND COSTS

¶45 Buyers argue they are entitled to attorney fees and costs on appeal under RAP 18.1, and under paragraph 21 of the Option's purchase and sale agreement, which provides attorney fees and expenses to the prevailing party in a lawsuit concerning the Option. Because Buyers are the prevailing party on appeal, we award them attorney fees and costs in an amount to be determined by our court commissioner under RAP 18.1.

¶46 We reverse the trial court's grant of partial summary judgment to Ledaura and remand.

BRIDGEWATER and QUINN-BRINTNALL, JJ., concur.

Review denied at 169 Wn.2d 1030 (2010).