[No. 5833–II.   Division Two.   December 29, 1981.]

James D. Huber, et al, *Appellants,* v. Coast Investment Company, Inc., et al, *Respondents.*

*Dale J. Galvin* and *Abbott, Curtis, Galvin & Sandell,* for appellants.

*David Shenton* and *Casey, Pruzan, Kovarik & Shulkin,* for respondents.

PEARSON, J.—Plaintiffs, James and Dianna Huber, appeal a dismissal of their suit for an equitable lien or fraudulent conveyance against Eileen Ceccanti. We agree with the trial court that no equitable lien was established on Ms. Ceccanti's home, and conclude that the doctrine of constructive trust precludes a finding of fraudulent conveyance. Accordingly, we affirm.

The evidence presents a picture of an opportunist taking advantage of both the Hubers and Ms. Ceccanti while utilizing the latter's home as a pawn. The central figure in this dispute is one Rocco Consalvo, whom the trial judge characterized as a self–styled "Don Juan." In March 1978, Jim Huber agreed to assist Consalvo, a business acquaintance, in purchasing a commercial property management company, Coast Investment Company (Coast). Consalvo had been employed by Coast, and the owners desired to sell the business. Although Huber has significant business acumen, and Consalvo was already delinquent in a $3,500 personal loan to him, Huber agreed to proceed with the transaction. Huber purchased the Coast premises and stock. Consalvo then entered into a lease of the premises and a long–term stock purchase agreement with Huber.

Consalvo operated the business in a reckless and extravagant manner, leasing luxury cars and purchasing expensive office equipment and furniture. The company soon experienced "cash flow" problems and in May 1978 Huber acted as a guarantor of a $30,000 90–day loan extended by Seattle–First National Bank. Huber inquired of Consalvo about security for the loan; Consalvo advised him that he was about to come into title to some residential property which could be utilized.

Contemporaneous with the above events, Consalvo met 29–year–old Eileen Ceccanti. Consalvo did not disclose his marital status to Ms. Ceccanti, but proceeded to entertain her in a lavish manner. A romantic relationship developed. Ms. Ceccanti accepted a position at Coast, at a handsome salary.

For several months, Ceccanti had unsuccessfully listed

her view home with realtors. Consalvo suggested that he could take it off her hands, and Coast would convert the home into a condominium. In June 1978, without the benefit of counsel, Ceccanti executed a quitclaim deed to Consalvo. In exchange, Coast Realty executed an unsecured promissory note for $150,000, due in 2 years.

In late July, the bank holding the mortgage to the house notified Ceccanti that her mortgage payments were in arrears. A title check revealed that two recent judgments against Coast and Consalvo constituted liens on the property. Additionally, Coast had not paid Ceccanti or other employees their monthly wages. The company's lease payments to Huber were also in arrears. With this evidentiary record, the trial court found that Ms. Ceccanti had reason to believe Coast and Consalvo were probably insolvent at this time. Feeling uneasy about the transfer to Consalvo, Ms. Ceccanti contacted her attorney.

Also in late July, Consalvo notified Huber that he had received title to a piece of residential property. On July 28, 1978, Huber and Consalvo entered into an agreement prepared by Huber's attorney. Huber believed that agreement would operate as a lien on the property should he have to go forward as guarantor on the $30,000 loan. The agreement provided that due to Huber's guaranty of the bank loan and Consalvo/Coast's default of the lease:

> That upon the sale by Coast and/or Consalvo of [the subject property] Coast and/or Consalvo, whichever shall be entitled to the net proceeds of said sale, shall upon receipt of said proceeds remit such amount . . . to [Sea–First] as may be necessary to pay off in full loan [between Coast and Sea–First] or any renewal of said loan; further, if Huber, as guarantor, shall have paid off all or part of said loan Huber shall be reimbursed from said net proceeds to the extent of any payments made by Huber on said loan or renewal thereof.

Huber also agreed to forbear for 30 days any legal rights due to Coast's default of the lease. The agreement was immediately recorded.

Upon reviewing the conveyance to Consalvo, Ceccanti's

attorney filed suit for fraud on August 14, 1978. A title check did not reveal the above agreement. On August 17, 1978, in exchange for an order of dismissal without prejudice, Consalvo quitclaimed the residence back to Ms. Ceccanti. She immediately filed the deed. It is apparent from the record and the court's detailed findings that neither Ceccanti nor Huber knew of Consalvo's "dealing" with the other until some time later. Within 3 months, Huber filed this suit against Coast, Consalvo, and Ceccanti. Seattle–First called the note, and in December 1978, Huber, as guarantor, satisfied the claim. Default judgment was entered against Consalvo. In a case tried to the court, Huber argued that the agreement between him and Consalvo constituted an equitable lien on the Ceccanti residence. Alternatively, he argued that the reconveyance from Consalvo to Ms. Ceccanti was a fraud on creditors. The court found neither theory applicable and dismissed the suit. Huber appeals. We address each claim in turn.

The essence of an equitable mortgage is the intent of the parties to create a lien on the property described to secure an obligation. *Redemptorist Fathers v. Purdy,* 174 Wash. 358, 24 P.2d 1089 (1933). The intent may be derived from the express language of the agreement or by necessary implication, but it must appear unequivocally. *Redemptorist Fathers v. Purdy, supra; Beaulaurier v. Buchanan,* 16 Wn. App. 887, 559 P.2d 1372 (1977). After reviewing the document, we are in accord with the trial court. The clear import of the agreement is a promise by Coast/Consalvo to pay proceeds out of the fund *when* the house is sold. The fund is first available to the lender, Seattle–First National Bank. It is only available to Mr. Huber *should* he be required to pay the $30,000 obligation. We note that the agreement does not even require that the residence be sold, or that "best efforts" be made to sell it.

We find no intent to create a lien within the four corners of the agreement. The only evidence on this matter was plaintiff's testimony. Similarly, we find support for the trial court's finding that the evidence does not demonstrate

Consalvo intended the agreement be recorded. We will not disturb the finding. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

The language in the agreement of a contingent promise to pay precludes a finding that an equitable lien was created. This conclusion is in accord with the general rule that contracts be construed against the drafter. *Guy Stickney, Inc. v. Underwood,* 67 Wn.2d 824, 410 P.2d 7 (1966).

On appeal, plaintiff asserts that the reconveyance from Consalvo to Ceccanti was in derogation of the rights of other general creditors and a fraudulent conveyance under RCW 19.40.040.[1] This statute allows a plaintiff to have a conveyance set aside if he can demonstrate a lack of fair consideration in the exchange. Fair consideration includes the concept of "good faith." In *Sparkman & McLean Co. v. Derber,* 4 Wn. App. 341, 348, 481 P.2d 585 (1971), we stated that a conveyance will fail for lack of good faith when substantial evidence establishes a lack of "no intent to, or knowledge of the fact that the activities in question will, hinder, delay, or defraud others." *Tacoma Ass'n of Credit Men v. Lester,* 72 Wn.2d 453, 458, 433 P.2d 901 (1967).

The established fact of this case is that defendant Ceccanti "had reason to believe Coast and Consalvo were probably insolvent." Arguably, we should set the conveyance aside as not meeting the good faith requirement we outlined in *Sparkman & McLean Co., supra.* We do not determine whether this finding satisfies the quantum of proof required by *Sparkman & McLean Co.,* but resolve the case on other grounds. After reviewing the facts and law of this case, we are convinced that Consalvo held this property as a constructive trustee for Ceccanti prior to the reconveyance.[2] Thus, the fraudulent conveyance statute has

---

[1] Below, plaintiff argued the conveyance was fraudulent under RCW 19.40.040 and RCW 19.40.070. The latter requires clear and convincing proof of intent to defraud by the transferor. That theory is not pursued on appeal.

[2] The theory of constructive trust was not formally presented below, but the

no application.

■ A constructive trust will be found when property is acquired under circumstances such that the holder of legal title would be unjustly enriched at the expense of another interested party. *Kinne v. Kinne,* 27 Wn. App. 158, 617 P.2d 442 (1980). A finding of a constructive trust amounts to a holding that the wrongdoer ought to be treated as if he had been a trustee for the beneficiary from the time he began to hold the property unconscionably. G. Bogert, *Trusts and Trustees* § 471, at 6–7 (2d rev. ed. 1978). The right of a trust beneficiary to reclaim the trust property or interest is cut off by a bona fide purchaser who acquires such interest for value in good faith, and without actual or constructive notice of any breach of trust. G. Bogert, *Trusts and Trustees* § 881 (2d ed. 1962).

The trial court found specifically and plaintiff's counsel conceded that Ceccanti was defrauded by Consalvo. Under the principles outlined above, Consalvo became constructive trustee of the residential property as of the date Ceccanti quitclaimed her interest to him.

■■ In light of our previous conclusions, we cannot find Huber became a bona fide purchaser who cut off Ceccanti's rights. To qualify as a bona fide purchaser, which extinguishes the beneficiary's rights, three conditions must be satisfied: (1) the party must have acquired "legal title" to the property in question; (2) he must have paid value therefor; and (3) he must have been innocent of knowledge of the equity against the property at the time when he paid his value and acquired his title. *Chittick v. Boyle,* 3 Wn. App. 678, 479 P.2d 142 (1970). G. Bogert, *supra* § 881, at 113. The concept of "legal title" is not satisfied in this case. Huber never acquired a "legal interest" in the property prior to its reconveyance; he merely had an agreement with

court's oral opinion reflects its concern for the equities of the case. In disposing of this case on this theory, we adhere to the precept that a trial court's decision may be affirmed on any theory within the pleadings and proof. *Gross v. Lynnwood,* 90 Wn.2d 395, 583 P.2d 1197, 96 A.L.R.3d 187 (1978).

Consalvo to receive proceeds *if* the residence were sold and *if* Huber had paid the $30,000 loan. Such contingent benefits are not legal interests. G. Bogert, *supra* § 885, at 131.

We conclude that a constructive trust existed. Necessarily, the subsequent transfer from Consalvo to Ceccanti cannot be attacked as a fraudulent conveyance. The property was not a fund available to Consalvo's creditors, including Mr. Huber. *See* 37 Am. Jur. 2d *Fraudulent Conveyances* § 102 (1968). We agree with the trial court's observation that Ceccanti did not get any more than she was entitled to, and that is the return of her property.

Affirmed.

PETRIE, A.C.J., and PETRICH, J., concur.