937 P.2d 1143 (1997)
J. Stephen HALL, individually, Appellant,
v.
CUSTOM CRAFT FIXTURES, INC., a Washington corporation; [J]erald R. Dow and Diane Dow, a marital community; Darell A. Dow and Debbie Dow, a marital community, Russel I. Walsh and Barbara Walsh, a marital community, Respondents.
No. 19079-6-II.
Court of Appeals of Washington, Division 2.
June 6, 1997.
As Amended on Denial of Reconsideration August 8, 1997.
*1144 Kurt Lichtenberg, Bellevue, for Appellant.
Edward Sydney Winskill, Davies Pearson, P.C., Tacoma, for Respondents.
MORGAN, Judge.
J. Stephen Hall sued Custom Craft Fixtures, Inc. (CCF), Jerald R. Dow and Darell A. Dow for employment compensation, including performance bonuses, allegedly due under a written employment agreement. After CCF went bankrupt, the trial court granted summary judgment in favor of the Dows, and Hall filed this appeal. Taking the facts and reasonable inferences in the light most favorable to Hall,[1] we reverse and remand for trial.
At all times material to this case, Jerald Dow was the chairman of the board and controlling shareholder of CCF. Both he and his son Darell were corporate directors and employees.
In the spring of 1988, Hall was considering employment as CCF's president and chief executive officer. According to Hall, he and Jerald Dow
had several conversations where I made it clear that I was NOT going to become/remain involved in the corporation unless I had the personal guarantee of Dow on any and all compensation that I was going to become entitled to.... [W]hile I was comfortable with Dow's own financial strength, I was not going to spend the time and energy getting the corporation back on its feet (it was essentially bankrupt at the time I was brought onboard) without the absolute assurance that if I met the bonus goals, I would actually get the money. The only way I thought I could be so assured was to have Mr. Dow's personal guarantee on the incentive plan and they all understood that and agreed to it.[[2]]
The outcome of these discussions, Hall asserts, was "that if certain goals were met at the end of the fiscal year (Feb), I would become entitled to a bonus calculated at 10% of the pre-tax, pre-incentive income for the past year."[3]
In the fall of 1988, still according to Hall,
Dow and I had discussions (this was his suggestion) about including his son Darell Dow in the incentive plan under terms similar to minei.e., 10% of the pre-tax, pre-incentive income. I agreed to that as it had no impact on my compensation. At about that time we started trying to get the package down in written form and Dow said his attorney (and the corporation's attorney) Mr. Tim McDevitt, would prepare the documents. Sometime after that we started getting drafts of proposals, but it was not a high priority for either of us. In December of 1988 or January 1989 the major lender/secured creditor (1st Interstate Bank) became involved in the sense that Dow wanted them to approve of the plan. At about that time Dow suggested that the bank might want the corporation to have the ability to defer the payment of any bonuses or incentive compensation if the payment might adversely impact corporate cashflow or other financial aspects of the company. I objected to that indicating that (1) as he controlled the corporation, I didn't want my bonus deferred indefinitely while other money was paid out in salary or other incentive payments and (2) I didn't want the financial status of the company, which was largely under his control, to mean that I might not get paid at all. Toward that end I insisted that he become personally liable for any bonus payments that got deferred because of the financial situation of the corporation. Dow's initial response was "let me think about it." A day or two later after I again

*1145 insisted, he agreed. Later when the documents were circulated and I asked how the personal guarantee was going to be handled he told me that he was going to be signing in his individual capacity as well as in his corporate capacity and that his understanding, based upon his discussion with his attorney McDevitt, was that the effect of that would be as a personal guarantee, i.e. he would be personally liable.[[4]]
On March 14, 1989, Hall, Jerald Dow and Darell Dow each signed a letter addressed to Hall. The letter stated in part:
The primary purpose of the letter is to set forth in writing the terms and conditions of our Agreement with respect to your employment as President and Chief Executive Officer of Custom Craft Fixtures, Inc. (the "Company"). We orally agreed several months ago to most of the terms and conditions described herein, but there were a few key points upon which we had not reached agreement. A secondary purpose of this Agreement is to eliminate the possibility of any misunderstanding down the road by also describing the financial terms and conditions through which Darell and I are employed by the Company as well.
The letter described, among other things, the compensation to which Hall would be entitled, including the bonuses and other items for which he sues here. The letter did not expressly state who would pay or guarantee Hall's compensation, but it was signed by Jerald Dow acting in his individual capacity and in his capacity as chairman of the board of directors of CCF; by Darell Dow acting in his individual capacity; and by Hall acting in his individual capacity and in his capacity as president of CCF.
In October 1991, Hall sued, claiming that CCF had failed to pay about $65,000 due under the terms of the March 14 agreement. In April 1992, he amended his complaint to increase the amount due to about $70,000, and to allege that CCF, Jerald Dow and Darell Dow were jointly and severally obligated to pay the amount due. By then, apparently, CCF was insolvent.
In October 1994, Jerald and Darell Dow moved for summary judgment. Neither submitted an affidavit or declaration refuting Hall's assertions set forth above. Each did, however, support the motion for summary judgment with excerpts from the deposition of Timothy J. McDevitt, the attorney who had drafted the March 14 letter while representing CCF and Jerald Dow. According to McDevitt, Jerald and Darell signed the March 14 letter in their individual capacities not because they intended to personally pay or guarantee Hall's compensation, but only because they intended to restrict their own compensation to an amount not greater than Hall's. As McDevitt explained:
Steve [Hall] was concerned that there was never going to be any incentive compensation paid because Jerry [Dow] could pay out, if he wanted to, all the profits to himself as a bonus, so Jerry agreed that he would restrict his compensation and Darell's compensation pursuant to the same contract that Steve was going to be restricted by.
Hall testified, however, that McDevitt was not his attorney, that he and McDevitt never had "any significant contact,"[5] and, in essence, that McDevitt never objectively manifested anything to him except the contents of the March 14 letter itself.
On December 2, 1994, the trial court heard argument on the Dows' motion for summary judgment. The Dows argued that "the court need not go beyond [the written agreement's] four corners,"[6] and that the court should ignore the circumstances described in Hall's affidavit. Apparently agreeing with this position, the trial court ruled orally:
I read the agreement which is embodied in a letter drafted by Mr. McDevitt dated March 14, 1989, ... and I came to this *1146 conclusion: There is not even a hint that this letter embodies any kind of a personal guarantee of compensation by these individuals. In the language of the agreement taken on its four corners, not even a hint of it.
It is merely an agreement between three individuals who are employees of this corporation as to how they are to be paid in various ways, bonuses, incentives and the like. That's what it says. It doesn't say anything else. The individuals' signatures are not a personal guarantee by Hall or Dow to his salary, none.[[7]]
The court then signed a written order granting the motion for summary judgment.
As the court was signing its written order, Hall orally moved to amend his complaint to allege, for the first time, an oral guarantee agreement. The trial court responded, "That's not before the Court today."[8]
On December 12, Hall filed a written motion to amend. On December 23, the trial court denied the motion, essentially on grounds that the case had already been decided. Citing Trust Fund Services v. Glasscar,[9] the court commented that the motion "was an untimely attempt to insert new circumstances into the proceedings too late in the game."[10]
On appeal, Hall claims that the March 14 letter is susceptible of two reasonable but competing interpretations. An interpretation favoring him is that the Dows were agreeing, as he had asked them to, (a) to restrict their own compensation to an amount not greater than his, and (b) to personally guarantee his. An interpretation favoring the Dows is that they were agreeing (a) to restrict their own compensation, but (b) not to personally guarantee his. Because of these reasonable but competing interpretations, he says, there is a genuine issue of fact that must be resolved at trial.
The goal of construing a contract is to determine and effectuate the parties' mutual intent. As the Supreme Court said in Berg v. Hudesman:
It is deceptively simple to state the purpose of a court in interpreting a contract. "The cardinal rule with which all interpretation begins is that its purpose is to ascertain the intention of the parties." [[11]]
When analyzing the parties' intent, a court must examine not only the four corners of any writing the parties may have signed, but also the circumstances leading up to and surrounding the writing. As the Supreme Court said in Berg:
[E]xtrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent. We adopt the Restatement (Second) of Contracts §§ 212, 214(c) (1981). Section 212 provides:
(1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances, in accordance with the rules stated in this Chapter.
(2) A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.
As explained in comment b to this section:
It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be *1147 plain except in a context. Accordingly, the rule stated in Subsection (1) is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. [[12]]
In short, "[a]greements and negotiations prior to or contemporaneous with the adoption of a writing" must be considered when determining "the meaning of the writing, whether or not integrated."[13]
When considering the circumstances leading up to and surrounding a writing, a court examines the parties' objective manifestations, but not their "unilateral or subjective purposes and intentions about the meanings of what is written."[14] As the Supreme Court said after Berg:
[W]e have long adhered to the objective manifestation theory of contracts. This theory means that we impute to a person an intention corresponding to the reasonable meaning of his words and acts. Petitioner's unexpressed impressions are meaningless when attempting to ascertain the mutual intentions of the parties.[15]
As with any other fact, mutual intent may be established directly or by inference[16]but any inference must be based exclusively on the parties' objective manifestations.[17]
Given these rules, summary judgment is proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning.[18] Summary judgment is not proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has two (or more) reasonable but competing meanings.[19] Whether summary judgment is proper in a particular case depends on the facts of that case.
Here, summary judgment was not proper. A reasonable person reading the March 14 letter could conclude, based on Hall's description of the parties' negotiations and the parties' individual signatures on the March 14 letter, either that Jerald Dow and Darell Dow were assenting to guarantee Hall's compensation and restrict their own, or that they were assenting only to restrict their own. We hold that the March 14 letter is susceptible of two reasonable but competing meanings, and that a trial is required on Hall's written contract claim.
In addition to contending that the trial court erred by granting summary judgment on his written contract claim, Hall contends that the trial court erred by denying him leave to amend his complaint so as to allege an oral contract claim. The trial court's only basis for so ruling was that the case had already been disposed of. This is no longer a concern, given our ruling that a trial is required on remand. It follows that the trial court should permit the amendment on remand, subject of course to any further proceedings *1148 that otherwise may be appropriate.[20]
Reversed and remanded for trial.
BRIDGEWATER, Acting C.J., and HUNT, J., concur.
NOTES
[1] Scott Galvanizing, Inc. v. Northwest EnviroServices, Inc., 120 Wash.2d 573, 580, 844 P.2d 428 (1993).
[2] Clerk's Papers at 74.
[3] Clerk's Papers at 74.
[4] Clerk's Papers at 75-76.
[5] Clerk's Papers at 73.
[6] Report of Proceedings at 6.
[7] Report of Proceedings at 14.
[8] Report of Proceedings at 15.
[9] 19 Wash.App. 736, 745, 577 P.2d 980 (1978).
[10] Report of Proceedings at 24.
[11] Berg v. Hudesman, 115 Wash.2d 657, 663, 801 P.2d 222 (1990); see also U.S. Life Credit Life Ins. Co. v. Williams, 129 Wash.2d 565, 569, 919 P.2d 594 (1996); Scott, 120 Wash.2d at 580, 844 P.2d 428; DeBenedictis v. Hagen, 77 Wash.App. 284, 290, 890 P.2d 529 (1995).
[12] Berg, 115 Wash.2d at 667-68, 801 P.2d 222.
[13] Berg, 115 Wash.2d at 668, 801 P.2d 222, quoting Restatement (Second) of Contracts § 214(c); see also U.S. Credit, 129 Wash.2d at 569, 919 P.2d 594; Tanner Elec. Co-op. v. Puget Sound Power & Light Co., 128 Wash.2d 656, 674, 911 P.2d 1301 (1996); Scott, 120 Wash.2d at 580, 844 P.2d 428.
[14] Lynott v. National Union Fire Ins. Co., 123 Wash.2d 678, 684, 871 P.2d 146 (1994).
[15] Lynott, 123 Wash.2d at 684, 871 P.2d 146 (quoting Dwelley v. Chesterfield, 88 Wash.2d 331, 335, 560 P.2d 353 (1977)); see also Multicare Med. Ctr. v. Department of Social & Health Servs., 114 Wash.2d 572, 587, 790 P.2d 124 (1990).
[16] See Dwelley, 88 Wash.2d at 335, 560 P.2d 353 ("[W]e impute to a person an intention corresponding to the reasonable meaning of his words and acts.").
[17] Lynott, 123 Wash.2d at 684, 871 P.2d 146; Dwelley, 88 Wash.2d at 335, 560 P.2d 353.
[18] Tanner, 128 Wash.2d at 674, 911 P.2d 1301; Scott, 120 Wash.2d at 580, 844 P.2d 428.
[19] Tanner, 128 Wash.2d at 674, 911 P.2d 1301; Scott, 120 Wash.2d at 580, 844 P.2d 428.
[20] CR 15(a). Nothing we have said precludes the trial court, on remand, from granting or denying a defense motion for summary judgment on the oral contract claim. That claim not having been pled before now, neither the trial court nor this court have ruled on its sufficiency, or on defenses to which it might be subject.