[No. 26048-4-II. Division Two. April 19, 2002.]

BNC MORTGAGE, INC., *Appellant*, v. TAX PROS, INC., *Respondent*.

240

*Donald J. Courser* (of *Stoel Rives, L.L.P.*), for appellant.
*James D. Hamilton*, for respondent.

MORGAN, J. — BNC Mortgage, Inc., and Tax Pros, Inc., hold liens on the same piece of real property. Each claims that its lien is superior to the other's. The trial court held that Tax Pros' lien is superior, and we affirm.

In 1993, Floyd and Margaret Scott owned and operated a corporation called Mobile Truss, Inc. (hereinafter Mobile). Mobile borrowed money from Tax Pros. The Scotts personally guaranteed that Mobile would pay its debt. Mobile defaulted and later declared bankruptcy.

On December 9, 1994, in Clark County Superior Court, Cause Number 94-2-04494-3, Tax Pros sued the Scotts on their personal guarantee. On December 12, 1994, Tax Pros and the Scotts stipulated to a prejudgment writ of attachment.[1] On December 13, 1994, the sheriff recorded the writ with the Clark County Auditor, thus attaching the Scotts' Clark County residence.[2]

On May 5, 1995, Tax Pros moved for partial summary judgment. On September 29, 1995, the superior court granted Tax Pros' motion. The court ruled that the record showed, so clearly reasonable minds could not differ, that the Scotts owed Tax Pros $268,009. The court expressly directed entry of a partial final judgment, even though it had yet to resolve some of Tax Pros' claims. The judgment was entitled "Partial Summary Judgment" and included, pursuant to CR 54(b), the following language:

4. All other issues not specifically resolved herein shall remain for trial.

5. The Court finds that defendants are liable to plaintiffs for the amount set forth herein, that continued delay in the collection of this amount is detrimental to the plaintiff and the interests of justice, and that there is no just reason for delay in the entry of judgment herein. The Court hereby directs the entry of this judgment.[3]

In January 1996, the Scotts obtained a $285,000 loan from Ford Consumer Finance Corporation. They secured the loan with a deed of trust against their residence. The deed was signed on January 23 and recorded on January 24. Tax Pros received $170,000 of the loan proceeds and

---

[1] *See* RCW 6.25.020 ("plaintiff at the time of commencing an action, or at any time afterward before judgment, may have the property of the defendant . . . attached").

[2] *See* RCW 6.25.110 (after issuance, writ may be delivered to sheriff "of any county in which property of the defendant may be"); RCW 6.17.160(1) (sheriff levies upon real property by "recording a copy of the writ, together with a description of the property attached, with the recording officer of the county in which the real estate is situated").

[3] Clerk's Papers (CP) at 15-16.

partially satisfied its 1995 judgment.[4] Because part of the $170,000 went to pay interest, the unpaid balance on Tax Pros' judgment continued to exceed $100,000.

In exchange for receiving the $170,000, Tax Pros made two concessions pertinent here. First, it signed a written subordination contract dated January 18, 1996. That agreement provided in part as follows:

1.Tax Pros, Inc. . . . [,] referred to herein as "subordinator", is the owner and holder of an Amended Judgment entered in Clark County Superior Court Cause # 94-2-04494-3.

2.Ford Consumer Finance Company[,] referred to herein as "lender", is the owner and holder of a mortgage dated January 23, 1996, executed by Floyd and Margaret Scott, recorded under Auditor's file No. 9601240050.

3.Floyd Scott and Margaret Scott, husband and wife, referred to herein as "owner", are the owners of all the real property described in the mortgage identified above in paragraph 2.

4.In consideration of benefits to "subordinator" from "owner", receipt and sufficiency of which is hereby acknowledged, and to induce "lender" to advance funds under its mortgage and all agreements in connection therewith, the "subordinator" does hereby unconditionally subordinate the lien of his mortgage identified in Paragraph 1 above to the lien of "lender's["] mortgage, identified in Paragraph 2 above.[5]

Second, Tax Pros agreed not to pursue its unresolved claims in Clark County Cause Number 94-2-04494-3—if the Scotts made regular monthly payments on the remaining balance of its 1995 judgment. If the Scotts failed to make such payments, Tax Pros would further prosecute those claims.

After the Ford loan transaction, the Scotts did not make regular monthly payments on the balance of Tax Pros' judgment. Almost immediately, they were again in default to Tax Pros.

---

[4] The record does not show whether this money was paid by Ford to the Scotts and by the Scotts to Tax Pros, or whether it was paid directly by Ford to Tax Pros.

[5] CP at 75.

In March 1996, the Scotts sought a loan from BNC. BNC was willing to loan $378,750, secured by a deed of trust against the Scotts' residence and subject to various other conditions. Accordingly, it established an escrow and obtained a title report showing Tax Pros' 1994 lawsuit, 1995 judgment, and 1996 subordination agreement with Ford.

On May 31, 1996, while the loan was still in escrow, BNC asked Tax Pros to sign a subordination agreement in favor of BNC. Tax Pros refused.

BNC's loan closed in late July 1996, notwithstanding Tax Pros' refusal to sign a subordination agreement in BNC's favor. Ford was paid the amount remaining on its deed of trust ($272,885), Tax Pros was paid the amount remaining on its "Partial Summary Judgment" ($129,082), and Tax Pros filed a full satisfaction of its partial summary judgment.

In April 1997, Tax Pros asked for a trial on its unresolved claims in Cause Number 94-2-04494-3. In June 1997, after a three-day bench trial, the court ruled that the Scotts owed Tax Pros an additional $107,321 in damages, plus reasonable attorney fees and costs. The Scotts then filed for personal bankruptcy, so the entry of judgment was delayed.

In April 1999, the superior court entered a second final judgment requiring the Scotts to pay $136,871, plus prejudgment interest of $22,184. The court provided that the judgment would be enforceable

> only against the assets of Floyd and Margaret Scott secured in favor of [Tax Pros] by way of the Writ of Attachment previously entered in this matter . . . . Said previously issued Writ of Attachment is expressly preserved and the property attached therein is subject to execution to be issued pursuant to this judgment.[6]

In July 1999, BNC filed the present declaratory judgment action against Tax Pros and the Scotts. BNC alleged that its deed of trust was superior to Tax Pros' 1999 judgment. BNC also alleged that *Ford*'s deed of trust was superior to the

___

[6] CP at 44.

1999 judgment because of the Ford-Scott-Tax Pros subordination agreement, and that BNC should be equitably subrogated to Ford's deed of trust.

On or about October 1, 1999, Tax Pros moved for summary judgment.[7] Its Oregon counsel, a man named Roy Thompson, testified about the context within which the written subordination agreement had been signed. He stated in the first of his two affidavits:[8]

7. In late 1995 settlement discussion began [with] ... counsel for Floyd and Margaret Scott. The parties eventually agreed that in order to allow the Scotts to obtain financing, Tax Pros would subordinate its first position Writ of Attachment to a $285,000 deed of trust in favor of Ford Consumer Credit Corporation. $170,000 of the $285,000 loan was to be paid to Tax Pros. In order to protect Tax Pros' then second position security interest, the remaining loan proceeds were to be used to complete the home. As a further protection, the Scotts were to make monthly payments at an agreed upon interest rate. Tax Pros would forgive further litigation or collection efforts against the Scotts as long as these payments were made. If payments were not made, Tax Pros would be free to proceed further against the Scotts.[9]

Thompson stated in the second of his two affidavits:

3. My [first] Affidavit was drafted by Tax Pros' Washington counsel and proofread by me. The Affidavit was drafted inaccurately by Washington counsel. I did not catch the error ... before signing it.

4. In fact, the Writ of Attachment was never discussed with Ford Consumer Finance Co. When Tax pros initially settled with the Scotts in early 1996, the agreement was that Tax Pros' existing judgment would be subordinated to

---

[7] BNC also filed a cross-motion for summary judgment. It has not included that motion in the record on appeal, and it does not assign error to its denial.

[8] Thompson's second affidavit was actually presented in connection with BNC's later motion for reconsideration. The trial court granted the motion to reconsider in the sense that it examined the two affidavits together. We also examine them together, and for convenience we describe both here.

[9] CP at 53.

the Ford Consumer Finance Co. Deed of Trust. The Judgment was to be amended to add language I though[t] important to Tax Pros. The Scotts were to make payments on the balance of the judgment. If they made the payments to completion, there would be no further litigation. . . .

5. The settlement strategy was to use the unlitigated claims as additional security against the Scott's failure to make payments on the portion of the judgment remaining unpaid after payment from the proceeds of the Ford loan. . . . At no time did Tax Pros intend to subordinate the unliquidated claims to the Ford loan.

6. . . . Subordinating the entire set of claims . . . was never proposed by Ford. Had it been, it would have been rejected.[10]

On October 21, 1999, BNC asked to postpone the hearing on Tax Pros' motion. It said that "through such discovery devices as interrogatories and/or depositions," it wanted to explore "the intent of the parties to the original subordination agreement."[11] In the end, however, BNC never offered testimony from Ford, the Scotts, or anyone else involved in the Ford loan transaction. It relied exclusively on Thompson's testimony supplemented by the escrow file from its own loan transaction.[12]

In January 2000, the trial court granted Tax Pros' motion for summary judgment. It ruled or assumed that Tax Pros' 1999 judgment related back to the 1994 writ of attachment, and thus was superior to BNC's deed of trust. It expressly ruled that Tax Pros had not subordinated its 1999 judgment to Ford's deed of trust; that Tax Pros' 1999 judgment related back to its 1994 writ of attachment; and that Tax Pros' 1999 judgment was superior to Ford's deed of trust. It commented that if it had found Ford's deed of trust to be superior, it would have subrogated BNC to Ford's lien.

In February 2000, BNC obtained new counsel and sought reconsideration. The trial court allowed BNC to present

[10] CP at 282-83.

[11] CP at 332, 333.

[12] The escrow file from BNC's transaction contains little of consequence here.

additional evidence, reexamined its determinations, and reached the same result. In May 2000, the trial court entered a final declaratory judgment for Tax Pros.

The first issue on appeal is whether the lien of BNC's deed of trust is prior to the lien of Tax Pros' 1999 judgment. The second issue on appeal is whether the lien of Ford's deed of trust is prior to the lien of Tax Pros' 1999 judgment and, if so, whether BNC should be equitably subrogated to Ford's lien. We address these issues separately.

## I

As just indicated, the first issue on appeal is whether the lien of BNC's deed of trust is prior to the lien of Tax Pros' 1999 judgment. A judgment creates a lien against real estate in each county where the judgment is recorded.[13] A deed of trust creates a lien against the property it describes.[14] The lien first in time is the lien first in right,[15] unless the holder of the lien first in time voluntarily subordinates it.[16]

The parties in this case do not dispute that each has a lien against the Scotts' residence; that Tax Pros' lien arises

---

[13] *Hartley v. Liberty Park Assocs.*, 54 Wn. App. 434, 437, 774 P.2d 40, *review denied*, 113 Wn.2d 1013 (1989); *see also* RCW 4.56.200, .190.

[14] RCW 61.24.020 ("Except as provided in this chapter, a deed of trust is subject to all laws relating to mortgages on real property."); *Rustad Heating & Plumbing Co. v. Waldt*, 91 Wn.2d 372, 376, 588 P.2d 1153 (1979) ("statutory deed of trust is indeed a species of mortgage"); *John Davis & Co. v. Cedar Glen No. Four, Inc.*, 75 Wn.2d 214, 221-22, 450 P.2d 166 (1969) (mortgage "only creates a lien upon the land"); *Huber v. Coast Inv. Co.*, 30 Wn. App. 804, 808, 638 P.2d 609 (1981) ("essence of an equitable mortgage is the intent of the parties to create a lien on the property"); *Thomas v. Osborn*, 13 Wn. App. 371, 375, 536 P.2d 8 (1975) (mortgage arises when parties "intend to create a lien upon property").

[15] *Homann v. Huber*, 38 Wn.2d 190, 198, 228 P.2d 466 (1951); *Robb v. Kaufman*, 81 Wn. App. 182, 190, 913 P.2d 828, *review denied*, 130 Wn.2d 1020 (1996); *Wyatt Stapper Architects, P.S., v. 1501 Pac. Assocs.*, 60 Wn. App. 842, 843-44, 809 P.2d 206 (1991); *Jones v. Int'l Land Corp.*, 51 Wn. App. 737, 743, 755 P.2d 184 (1988); *CH2M Hill, Inc. v. Greg Bogart & Co.*, 47 Wn. App. 414, 416, 735 P.2d 1330, *review denied*, 108 Wn.2d 1023 (1987).

[16] *See, e.g., Nat'l Bank of Wash. v. Equity Investors*, 83 Wn.2d 435, 518 P.2d 1072 (1974); *Campanella v. Rainier Nat'l Bank*, 26 Wn. App. 418, 612 P.2d 460, *review denied*, 94 Wn.2d 1017 (1980).

from its 1999 judgment; or that BNC's lien arises from its 1996 deed of trust. The parties do dispute, however, which lien is first in time. Tax Pros argues that its 1999 judgment is prior to BNC's 1996 deed of trust because the 1999 judgment relates back to the 1994 attachment. BNC argues that its 1996 deed of trust is prior to the 1999 judgment because the 1999 judgment does not relate back to the 1994 attachment. The resulting question is whether the 1999 judgment relates back.

In general, a judgment lien against real estate relates back to the date on which the real estate was attached.[17] Some courts say that a writ of attachment results in an "attachment lien" that is "inchoate" pending judgment, but effective (i.e., "choate") once judgment is entered.[18] Other courts say that writ of attachment is merely a place marker; the writ gives notice that if judgment is later entered, the judgment lien will "relate back" to (i.e., take effect on) the date of attachment.[19] Either way, the result is the same.

Hoping to show that this rule does not apply here, BNC argues that the lien of a first final judgment can relate back, but that the lien of a second or subsequent final judgment cannot. BNC reasons that an attachment

---

[17] *Van de Vanter v. Davis*, 23 Wash. 693, 698, 700, 63 P. 555 (1901); *Logan v. Brooks*, 60 Wn. App. 777, 781, 807 P.2d 377, *review denied*, 117 Wn.2d 1016 (1991); *see also In re S. Cal. Plastics, Inc.*, 165 F.3d 1243, 1246 (9th Cir. 1999) ("The priority of the judgment lien relates back to the date of the attachment lien."); *Hill v. Baker*, 32 Iowa 302 (1871); *People's Bank v. Bilmor Bldg. Corp.*, 28 Conn. App. 809, 824, 614 A.2d 456, 464 (1992) ("A judgment lien relates back to the date of an attachment."); *Smart v. Burgess*, 35 R.I. 149, 85 A. 742, 744 (1913) ("When the judgment is rendered, it gives effect to the attachment, and relates back to the time when the attachment was made."); *Stockton v. Nat'l Bank of Jacksonville*, 45 Fla. 590, 598-99, 34 So. 897 (1903).

[18] *Dixon v. Barnett*, 3 Wash. 645, 647, 29 P. 209 (1892); *see also United States v. Brame*, 243 F. Supp. 29, 34-35 (D. Idaho 1965); *Puissegur v. Yarbrough*, 29 Cal. 2d 409, 412, 175 P.2d 830, 831-32 (1946); *Ward v. Commissioner*, 224 F.2d 547, 551 (9th Cir. 1955).

[19] *In re Aquarius Disk Servs., Inc.*, 254 B.R. 253, 256 (Bankr. N.D. Cal. 2000); *S. Cal. Plastics, Inc.*, 165 F.3d at 1246.

"merges" into the first final judgment and is thereupon exhausted.[20]

If we were to accept this argument, we would require the litigant who otherwise could use *both* CR 54(b) *and* the attachment statute (ch. 6.25 RCW) to choose between one or the other. The litigant who wanted security for all the relief he or she ultimately obtained could not take a partial final judgment under CR 54(b). The litigant who wanted partial relief without delay could not use the attachment statute to secure the rest of his or her relief. BNC does not tell us why we should force such a choice, we perceive no reason to do so, and thus we decline to do so.

Moreover, BNC's argument runs counter to the plain wording of RCW 6.25.020. That statute provides:

> The plaintiff at the time of commencing an action, or at any time afterward before judgment, may have the property of the defendant . . . attached . . . as security for the satisfaction of *such judgment as the plaintiff may recover.*[21]

This language cannot reasonably be read to mean that a plaintiff may have the defendant's property attached as security for the satisfaction *of a first partial judgment, but not as security for the satisfaction of a second or subsequent judgment.* It necessarily means that a plaintiff may have the defendant's property attached as security for the satisfaction of *any* judgment that the plaintiff may recover in the case. Thus, we hold that Tax Pros' 1999 judgment relates back to Tax Pros' 1994 attachment; that Tax Pros' 1999 judgment is first in time; and that the lien of Tax Pros' 1999 judgment is superior to the lien of BNC's deed of trust.

---

[20] BNC fails to support this proposition with any authority on point, even though it cites two federal cases: *S. Cal. Plastics, Inc.*, 165 F.3d 1243; *Brame*, 243 F. Supp. 29. Each of those cases involved only one judgment, so neither stands for the proposition BNC now asserts.

[21] (Emphasis added.)

## II

BNC argues that even if its own deed of trust is not prior to Tax Pros' 1999 judgment, Ford's deed of trust was. BNC additionally argues that it should be equitably subrogated to Ford's deed of trust. We address each proposition separately.

## A

In Section I, we held that Tax Pros' 1999 judgment relates back to its 1994 attachment. As a result, Tax Pros' 1999 judgment is superior to Ford's 1996 deed of trust[22]— unless, as BNC now claims, Tax Pros voluntarily subordinated its 1999 judgment to Ford's deed of trust when it signed the 1996 Ford subordination agreement. Tax Pros responds that when it signed the subordination agreement, it did not subordinate its 1999 judgment, even though it did subordinate its 1995 judgment.

 When interpreting a written contract, a Washington court must ascertain the meaning that the persons who used the words intended their words to have.[23] That meaning can vary according to the context in which the words were used.[24] Thus, the court must consider not just the words, but also the context in which the words were used.[25] Context can render ambiguous words that otherwise would not be, or clarify words that otherwise would be.

 When considering the context of a written contract, a Washington court adheres to the objective manifes-

---

[22] Neither party raises, and we do not consider, the question whether a court can establish relative priorities between two liens that never existed at the same time.

[23] *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990); *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 7, 937 P.2d 1143 (1997).

[24] *Berg*, 115 Wn.2d at 664 (quoting *Towne v. Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 62 L. Ed. 372 (1918) ("A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly . . . according to the circumstances and the time in which it is used.")).

[25] *Berg*, 115 Wn.2d at 667-68; *see also Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 188-89, 840 P.2d 851 (1992); *Hall*, 87 Wn. App. at 8.

tation theory of contracts,[26] subject to at least one modification. A court considers the parties' objective manifestations, but not their unexpressed subjective intentions.[27] Given that the written contract is itself an objective manifestation, it is deemed to have been read by the parties who signed it,[28] and it may not be contradicted—even if the offered evidence would otherwise be an objective manifestation.[29] Because a written contract predominates over a contradictory manifestation, a contradictory manifestation cannot alone be sufficient to raise a genuine issue of material fact.

■ A court can consider a written contract and its context either before trial or at trial. Before trial, a court examines affidavits or other materials offered in support of a motion for summary judgment. At trial, a court listens to witnesses and considers exhibits. If the contract's written words have but one reasonable meaning when read in context, a court may grant summary judgment before trial, or direct a verdict at trial.[30] If the contract's written words have two or more reasonable meanings (i.e., are "ambiguous"[31]) when read in context, a court may not grant sum-

[26] *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 699, 952 P.2d 590 (1998) (Washington follows objective manifestation theory of contracts); *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994); *N.W. Motors, Ltd. v. James*, 118 Wn.2d 294, 302, 822 P.2d 280 (1992); *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977).

[27] *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999); *Lynott*, 123 Wn.2d at 684; *Dwelley*, 88 Wn.2d at 335; *Hall*, 87 Wn. App. at 9.

[28] *Nat'l Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 912, 506 P.2d 20 (1973); *Max L. Wells Trust v. Grand Cent. Sauna & Hot Tub Co. of Seattle*, 62 Wn. App. 593, 602, 815 P.2d 284 (1991).

[29] *Hollis*, 137 Wn.2d at 695; *Lynott*, 123 Wn.2d at 683; *Berg*, 115 Wn.2d at 670.

[30] *See, e.g., Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 844 P.2d 1006 (1993), *cert. denied*, 510 U.S. 1047 (1994); *Watkins v. Restorative Care Ctr., Inc.*, 66 Wn. App. 178, 831 P.2d 1085, *review denied*, 120 Wn.2d 1007 (1992); *Vacova Co. v. Farrell*, 62 Wn. App. 386, 814 P.2d 255 (1991).

[31] *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576, 964 P.2d 1173 (1998); *Am. Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874, 854 P.2d 622 (1993); *Hoglund v. Omak Wood Prods., Inc.*, 81 Wn. App. 501, 504, 914 P.2d 1197, *review denied*, 130 Wn.2d 1018 (1996); *Syrovy v. Alpine Res., Inc.*, 68 Wn. App. 35, 40, 841 P.2d 1279 (1992), *aff'd*, 122 Wn.2d 544 (1993).

mary judgment or direct a verdict; instead, it must put the case to a trier of fact.[32]

In this case, BNC claims ambiguity while Tax Pros claims clarity. According to BNC, a reasonable person could read the Ford subordination agreement to mean either (1) that Tax Pros was subordinating both its 1995 judgment and its 1999 judgment, or (2) that Tax Pros was subordinating only its 1995 judgment. Tax Pros claims that a reasonable person could read the agreement only in the second way.

BNC advances three arguments to show ambiguity. First, it argues that the subordination agreement is ambiguous because a reasonable person could think that Tax Pros was subordinating either a mortgage or a judgment.[33] It bases this argument on Paragraphs 1 and 4 of the subordination agreement. As already seen, Paragraph 4 states that Tax Pros "unconditionally subordinates the lien of his mortgage identified in paragraph 1 to the lien of the [Ford's] mortgage." Rather than identifying a mortgage, however, Paragraph 1 states that Tax Pros "is the owner and holder of an Amended Judgment entered in Clark County Superior Court Cause # 94-2-04494-3."

Interestingly, we might agree with BNC if we were reading the subordination agreement without reference to its context (i.e., according to its "four corners").[34] We disagree, however, where we are obligated to read the agreement in light of the context in which it was formed. An undisputed part of its context is that Tax Pros had only a judgment against the Scotts' residence; Tax Pros never had or even contemplated a mortgage. A reasonable person taking context into account could think that Tax Pros was subordinating a judgment, but not that Tax Pros was subordinating a mortgage.

---

[32] *Scott Galvanizing, Inc. v. N.W. EnviroServices, Inc.*, 120 Wn.2d 573, 580, 844 P.2d 428 (1993); *Hall*, 87 Wn. App. at 9-10.

[33] Br. of Appellant at 17-18.

[34] Isolated from its context, the agreement could reasonably be read to mean either (1) that Tax Pros was subordinating a mortgage or (2) that Tax Pros was subordinating a judgment. Read in context, it cannot have the first meaning.

Second, BNC argues that even if a reasonable person would know that Tax Pros was subordinating a judgment, he or she would not know whether Tax Pros was subordinating its 1995 judgment or its 1999 judgment. BNC bases this argument on Paragraph 1's reference to an "amended" judgment and, looking to context, on the fact that there never was an "amended" judgment.[35] Again, however, we disagree. Executed on January 18, 1996, Paragraph 1 refers to an "amended" judgment that has *already been entered* in Cause Number 94-2-04494-3.[36] Undisputed evidence of context shows that the *only* judgment already entered on January 18, 1996, was the September 29, 1995 "Partial Summary Judgment." Additional evidence of context explains that while negotiating the Ford loan transaction, Tax Pros considered but never implemented an amendment to its 1995 judgment.[37] A reasonable person taking context into account could think that Tax Pros was subordinating its then-existing 1995 Partial Summary Judgment, but not that Tax Pros was subordinating its not-yet-obtained 1999 judgment.

Third, BNC argues that Thompson "conceded" in his first affidavit that Tax Pros "intended to subordinate all claims secured by the writ of attachment."[38] Tax Pros responds that Thompson's first affidavit contradicts the written subordination agreement and thus cannot be sufficient evidence to take the case to a trier of fact. Tax Pros also responds that Thompson later submitted a second affidavit explaining that the first affidavit was "drafted inaccurately," and that Tax Pros' intent was never to subordinate judgments not yet obtained.[39]

---

[35] Br. of Appellant at 18-19.

[36] CP at 75.

[37] CP at 283 (Thompson's second affidavit).

[38] Br. of Appellant at 17.

[39] CP at 282-83.

Even assuming that Thompson's first affidavit would be admissible at trial,[40] and even disregarding Thompson's claim of inaccurate drafting, we hold that the first affidavit is insufficient to take the case to a trier of fact. As already discussed, the Ford-Scott-Tax Pros written subordination agreement states that Tax Pros is subordinating a judgment that has *already been entered*. If read as BNC claims, Thompson's first affidavit is contradictory. Under the rules set forth above, the written contract predominates, the first affidavit is not by itself sufficient to take the case to a jury, and the subordination agreement is not ambiguous for present purposes.

## B

■■■ Even if Tax Pros had subordinated its 1999 judgment to Ford's deed of trust, we would not agree with the trial court's comment that BNC should be equitably subrogated to Ford's interest. Subrogation has at least two elements.[41] First, the person seeking it must have answered for the debt of another, usually by paying the other's creditor.[42] Second, the person must have acted " 'under some duty or compulsion, legal or moral,' "[43] and not as a volunteer or intermeddler.[44] A person is a "volunteer" if he or she acts "freely and without compulsion."[45] A person is under "duty or compulsion" if he or she acts to fulfill his or her own legal duty,[46] "to protect his own rights or to save his

---

[40] *See* ER 401; ER 801(d)(2)(iii).

[41] *Livingston v. Shelton*, 85 Wn.2d 615, 618-19, 537 P.2d 774 (1975), *cert. denied*, 424 U.S. 958 (1976).

[42] *Livingston*, 85 Wn.2d at 618-19.

[43] *Livingston*, 85 Wn.2d at 619 (quoting *Austin v. Wright*, 156 Wash. 24, 30, 286 P. 48 (1930)).

[44] *Livingston*, 85 Wn.2d at 619; *In re Liquidation of Farmers & Merchs. State Bank of Nooksack*, 175 Wash. 78, 88, 26 P.2d 631 (1933).

[45] *Goodrich v. Fahey*, 55 Wn.2d 692, 694, 349 P.2d 729 (1960).

[46] *Farmers & Merchs. State Bank of Nooksack*, 175 Wash. at 86.

own property,"[47] or in some other way not freely and voluntarily chosen by him.[48]

Even if both elements are met, subrogation is neither " 'an absolute right' "[49] nor "a fixed and inflexible rule of law or of equity."[50] It depends, rather, " 'upon the equities and attending facts and circumstances of each case.' "[51] Consistent with its essential purpose, "which is to provide for a proper allocation of payment responsibility,"[52] it " 'impose[s] ultimate responsibility for a wrong or loss on the party who, in equity and good conscience, ought to bear it.' "[53] Accordingly, it may be invoked " 'only where justice demands its application and where the equities of the party asking it are greater than those of his adversary.' "[54]

BNC was a volunteer here. It was not under any duty or compulsion to loan money to the Scotts, or to pay Ford. It had no interest in the Scotts' residence that it needed to protect. It did not act under any other duty or compulsion, but instead chose freely and voluntarily to avail itself of a business opportunity. Its hopes were to achieve a profit and, quite understandably, to secure itself against loss. That it may not realize those hopes is not by itself sufficient to

---

[47] *Murray v. O'Brien*, 56 Wash. 361, 372, 105 P. 840 (1909); *see also Livingston*, 85 Wn.2d at 619; *Farmers & Merchs. State Bank of Nooksack*, 175 Wash. at 86; *Isselstein v. Steinberger*, 106 Wash. 294, 297, 179 P. 855 (1919); *Goodrich*, 55 Wn.2d at 694.

[48] *Farmers & Merchs. State Bank of Nooksack*, 175 Wash. at 86 ("no general rule can be laid down").

[49] *Hu Hyun Kim v. Lee*, 145 Wn.2d 79, 88, 31 P.3d 665 (2001) (quoting *Coy v. Raabe*, 69 Wn.2d 346, 351, 418 P.2d 728 (1966)); *see also Livingston*, 85 Wn.2d at 619; *Farmers & Merchs. State Bank of Nooksack*, 175 Wash. at 86.

[50] *Hu Hyun Kim*, 145 Wn.2d at 88; *see also Livingston*, 85 Wn.2d at 619 (quoting *Austin*, 156 Wash. at 30).

[51] *Hu Hyun Kim*, 145 Wn.2d at 88 (quoting *Coy*, 69 Wn.2d at 351); *see also Livingston*, 85 Wn.2d at 619; *Farmers & Merchs. State Bank of Nooksack*, 175 Wash. at 86.

[52] *Mahler v. Szucs*, 135 Wn.2d 398, 411, 957 P.2d 632 (1998).

[53] *Hu Hyun Kim*, 145 Wn.2d at 88 (quoting *Mahler*, 135 Wn.2d at 411).

[54] *Livingston*, 85 Wn.2d at 619 (quoting *Lawyers Title Ins. Corp. v. Edmar Constr. Co.*, 294 A.2d 865, 869 (D.C. Ct. App. 1972)).

warrant a judicial alteration of Washington's long-settled scheme of lien priorities.

Even if BNC were not a volunteer, its "equities" would be no greater than Tax Pros'.[55] BNC and Tax Pros were both in the business of assessing and taking financial risks. BNC asked Tax Pros to subordinate its interest in the Scotts' residence, and Tax Pros expressly refused. BNC received a title report showing Tax Pros' 1994 lawsuit and 1995 judgment. The 1995 judgment stated that the trial court had not yet resolved all claims, and the 1994 court file showed an attachment. BNC has never stated under oath that it did not read the 1995 judgment and the 1994 court file;[56] nor, if it actually did not, has it explained under oath *why* it did not. In sum, the record here shows only that two relatively sophisticated lenders were dealing with each other at arms length; that each was assessing and accepting risk with the understandable hope of turning a profit; that each had the knowledge, resources, and ability to watch out for its own interests; and that neither should now be permitted to cast its loss, if any, on the other.

We do not overlook BNC's reliance on RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 7.6 (1997). Entitled "Subrogation," that section provides:

(a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:

(1) in order to protect his or her interest;

(2) under a legal duty to do so;

---

[55] *See Livingston*, 85 Wn.2d at 619 (quoting *Edmar Constr. Co.*, 294 A.2d at 869).

[56] We observe that the escrow file compiled in connection with BNC's loan transaction contains a copy of the 1995 judgment.

(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or

(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.

BNC does not fit within the general rule set forth in comment (a). That rule requires unjust enrichment, and unjust enrichment is not shown here. If BNC loses, Tax Pros may be enriched. If Tax Pros loses, BNC may be enriched. Given the circumstances already discussed, neither situation is more "unjust" than the other, and we should not judicially alter Washington's lien scheme.

Nor does BNC fit within any of the *Restatement*'s four illustrations. With respect to the first and second illustrations, there is no evidence that BNC was acting under a legal duty, or to protect its own preexisting interest, rather than voluntarily accepting a business opportunity with the risks inherent therein. With respect to the third illustration, there is no evidence that BNC was acting due to mistake other than its own, or that BNC was acting due to misrepresentation, duress, or deceit. With respect to the fourth illustration, there is no evidence that BNC "reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged," for BNC knew or should have known of Tax Pros' intervening lien.

Additionally, we do not overlook the trial court's citation to the Ninth Circuit case of *Mort v. United States*,[57] or BNC's citation to other cases from other jurisdictions. *Mort* seems contrary to Washington's definition of a volunteer, and the other cases seem either contrary or unpersuasive.

---

[57] *Mort v. United States*, 86 F.3d 890 (9th Cir. 1996) (applying Nevada law).

Finally, we do not overlook the recent Washington case of *Hu Hyun Kim v. Lee*.[58] In 1995, Sterling Trust Company loaned money to the Changs, secured by a first deed of trust against a Yakima residence. In 1997, Lee acquired the residence, subject to the lien of Sterling's deed of trust. Also in 1997, Kim obtained a judgment against Lee. He recorded the judgment with the Yakima County Auditor, and it became a second lien against Lee's residence.

In 1998, Pioneer National Bank loaned money to Lee, secured by a deed of trust against Lee's residence. Lee used Pioneer's loan proceeds to pay off Sterling's lien. Pioneer did not know of Kim's judgment because its title insurer, Yakima Title, had negligently failed to discover that judgment. After Sterling was paid off, Kim informed Pioneer's title insurer that his lien was superior to Pioneer's.

Still not informed of Kim's lien, Pioneer assigned its deed of trust to PHH Mortgage Services. PHH then obtained a new title policy from Yakima Title—which remarkably, despite its now-existent knowledge of Kim's judgment, again failed to list that judgment. When PHH learned of Kim's judgment, it tendered its defense to Yakima Title, which then claimed that PHH was equitably subrogated to Sterling's former lien.

Not surprisingly, the Supreme Court rejected PHH's claim of equitable subrogation. It did not, however, clearly explain why.[59] It might have been saying that PHH could not prevail without first demonstrating that PHH had no adequate remedy at law against its title insurer, and that PHH had not so demonstrated. If so, its ruling supports ours here, for BNC also has not shown that BNC lacks an

---

[58] *Hu Hyun Kim v. Lee*, 145 Wn.2d 79, 31 P.3d 665 (2001).

[59] We are somewhat perplexed by the Supreme Court's discussion of RESTATE-MENT (THIRD) OF PROP.: MORTGAGES § 7.3 rather than § 7.6. Section 7.3 seems designed to apply when a mortgagee replaces *its own* previous mortgage. The latter seems designed to apply when a mortgagee replaces *another* mortgagee's previous mortgage. It appears that the latter situation existed in *Kim*, for *Pioneer*'s loan proceeds went to pay off *Sterling*'s loan. We need not tarry, however, because neither BNC nor Tax Pros cites or relies on § 7.3. They argue only § 7.6, the section we just discussed.

adequate remedy at law against BNC's title insurer. If not, its ruling is at least consistent with ours here, for just as the *Kim* court declined to subrogate PHH or Pioneer to Sterling's lien, we decline to subrogate BNC to Ford's lien.

In summary, we hold that Tax Pros' lien is superior to BNC's lien because Tax Pros' 1999 judgment relates back to the 1994 writ of attachment. We also hold that Tax Pros' 1999 judgment is superior to Ford's lien because Tax Pros' lien antedates Ford's; because Tax Pros did not subordinate its lien to Ford's; and because BNC is not equitably subrogated to Ford's position. Finding that BNC's remaining arguments lack merit or need not be reached, we conclude that the trial court did not err.

Affirmed.

QUINN-BRINTNALL, A.C.J., and BRIDGEWATER, J., concur.